T.C. Memo. 2000-208

UNITED STATES TAX COURT

JACOB AND CHANA PINSON, ET AL.,[1] Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 7561-98,    7562-98,      Filed July 6, 2000.
7563-98,    7564-98,
7565-98,    7566-98,
7567-98,    19353-98,
19354-98,   19355-98,
19356-98,   19357-98,
19358-98,   19359-98.

These cases involve the proper tax treatment of

---

[1] Cases of the following petitioners are consolidated herewith: B. Mayer and Ella Zeiler, docket No. 7562-98; Joseph and Sara Deitsch, docket No. 7563-98; Joshua and Rachel Sandman, docket No. 7564-98; Deitsch Plastic Company, Inc., docket No. 7565-98; Mordecai and Bonnie Deitsch, docket No. 7566-98; David and Sara Deitsch, docket No. 7567-98; B. Mayer and Ella Zeiler, docket No. 19353-98; Mordecai and Bonnie Deitsch, docket No. 19354-98; Deitsch Plastic Company, Inc., docket No. 19355-98; Joshua and Rachel Sandman, docket No. 19356-98; David and Sara Deitsch, docket No. 19357-98; Jacob and Chana Pinson, docket No. 19358-98; Joseph and Sara Deitsch, docket No. 19359-98.

two types of payments received by Ps from an Israeli corporation:  (1) Payments made directly to certain of Ps and upon which taxes were paid to the Israeli Government, and (2) payments made to a partnership and reported by certain of Ps as their distributive shares of partnership income.

Held:  The payments made directly to Ps are to be characterized as compensation for services performed within the United States.  Hence, the amounts are not to be treated as foreign source income for purposes of calculating the credit for foreign taxes under sec. 901, I.R.C.

Held, further, the payments made to the partnership were not properly reported as partnership income.  They are not to be allocated as income to the corporate P.  Like the remittances above, these payments are to be characterized as compensation for services earned by the individual Ps, and as U.S. source income to the individual Ps, except as to the two Ps who resided in Israel.

Held, further, Ps are not entitled to seek a deduction for foreign taxes paid under sec. 164, I.R.C., in lieu of the disallowed foreign tax credits.

Held, further, the individual Ps are liable for accuracy-related penalties pursuant to sec. 6662(a), I.R.C., but the corporate P is not.


Robert J. Percy and Bruce Judelson, for petitioners.

Stephen C. Best and Bradford A. Johnson, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


NIMS, Judge:  Respondent determined the following deficiencies and penalties with respect to petitioners' Federal income taxes for the taxable years 1991 through 1994:

| Petitioners | Year | Deficiency | Penalties Sec. 6662(a) | Sec. 6662(h) |
|---|---|---|---|---|
| Jacob and Chana Pinson | 1991 | $351,904 | $48,478 | $38,990 |
| | 1992 | 708,327 | 120,628 | 30,538 |
| | 1993 | 48,566 | 131 | 19,120 |
| | 1994 | 429,683 | 59,695 | 52,483 |
| B. Mayer and Ella Zeiler | 1991 | -- | -- | -- |
| | 1992 | -- | 2,419 | -- |
| | 1993 | 12,730 | 153 | 2,041 |
| | 1994 | 121,574 | 24,315 | -- |
| Joseph and Sara Deitsch | 1991 | 353,295 | 47,921 | 48,528 |
| | 1992 | 792,926 | 136,778 | 43,838 |
| | 1993 | 100,364 | 122 | 39,935 |
| | 1994 | 421,993 | 58,038 | 52,720 |
| Joshua and Rachel Sandman | 1991 | 296,413 | 40,472 | 41,808 |
| | 1992 | 786,596 | 134,161 | 38,484 |
| | 1993 | 111,174 | 131 | 44,163 |
| | 1994 | 440,885 | 58,943 | 43,960 |
| Deitsch Plastic Company, Inc. | 1991 | 485,976 | -- | 194,390 |
| | 1992 | 728,139 | -- | 291,256 |
| | 1993 | 823,513 | -- | 329,405 |
| | 1994 | 748,409 | 27,085 | 245,193 |
| Mordecai and Bonnie Deitsch | 1991 | -- | -- | -- |
| | 1992 | 115,312 | 1,787 | 42,070 |
| | 1993 | 99,372 | 153 | 39,442 |
| | 1994 | 44,571 | 8,914 | -- |

| David and Sara | 1991 | 363,170 | 48,775 | 50,770 |
| Deitsch | 1992 | 790,380 | 130,075 | 60,296 |
| | 1993 | 30,004 | 153 | 11,972 |
| | 1994 | 314,102 | 37,868 | 49,904 |

Respondent further determined that if the 40-percent section 6662(h) accuracy-related penalty were deemed inapplicable, amounts upon which it had been computed were subject, in the alternative, to the 20-percent section 6662(a) penalty. Respondent has since conceded the section 6662(h) penalty.

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded to the nearest dollar.

These cases have been consolidated for purposes of trial, briefing, and opinion. Hereinafter and unless directed toward the collective position of all petitioning litigants, references to petitioners shall be to the individual petitioners, with the exception of B. Mayer and Ella Zeiler. The Zeilers' circumstances involve different considerations, and counsel represented at trial that their case has been entirely settled through stipulation. We shall discuss facts pertaining to the

Zeilers only to the extent necessary to comprehend the underlying context.  The corporate petitioner shall be referred to as Deitsch Plastic Company, Inc., or DPC.

After concessions, the issues remaining for decision are:

(1) The proper tax treatment of payments made directly from Flocktex Industries, Ltd. (FIL), an Israeli corporation, to certain of petitioners, and of foreign taxes paid thereon;

(2) the proper tax treatment of payments made from FIL to Deitsch Plastic Partners (DPP) and reported by certain of petitioners as their distributive shares of partnership income; and

(3) the applicability of accuracy-related penalties pursuant to section 6662(a) for negligence, intentional disregard of rules or regulations, and/or substantial understatement of income tax.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference.

### The Deitsch Family

The individuals involved in these consolidated cases are all members of the Deitsch family.  David Deitsch is the patriarch of the family, and Sara is his wife.  Mordecai Deitsch, Joseph Deitsch, Rachel Sandman, Ella Zeiler, and Chana Pinson are the children of David Deitsch.  Joshua Sandman, B. Mayer Zeiler, and

Jacob Pinson are David Deitsch's sons-in-law. At the time of filing their petitions in these cases, the David Deitsches, the Joseph Deitsches, and the Sandmans resided in New Haven, Connecticut. The Mordecai Deitsches and the Pinsons resided in Brooklyn, New York. The Zeilers were residents of Kiryat Malachi, Israel.

## Deitsch Plastic Company, Inc.

DPC was founded by David Deitsch and was incorporated in 1960. DPC is a U.S. corporation which maintained a principal place of business in West Haven, Connecticut, at the time of filing its petitions. The company is engaged in the manufacture and sale of coated vinyl and urethane laminated materials, primarily for use in the production of upholstery.

DPC has at all times been a privately held corporation with all stock being controlled by members of the Deitsch family. During the years in issue, ownership of DPC was distributed as follows:

| David Deitsch | 17 percent |
| Mordecai Deitsch | 15 percent |
| Joseph Deitsch | 17 percent |
| Joshua Sandman | 15 percent |
| B. Mayer Zeiler | 17 percent |
| Jacob Pinson | 17 percent |

(The fact that these stipulated percentages total only 98 is not further explained by the record.)

The above six shareholders were also employed in the DPC business. David Deitsch, the director and chief executive

officer of the company, oversaw all financial and administrative functions.  Each of the men, however, performed a variety of duties within the organization.  As stated by Joseph Deitsch, "in our company, * * * everybody is involved in everything" and "Everybody wears many hats."

Flocktex Industries, Ltd.

In the early 1970's, David Deitsch began, at the suggestion of his rabbi, to investigate the possibility of opening a business in Israel.  FIL was then established in 1974 as an Israeli corporation.  The company is located in Kiryat Malachi, Israel, and manufactures flocked fabrics principally for use in the production of drapery and upholstery.  Like DPC, FIL has at all times been closely held by members of the Deitsch family.  Stock ownership during the years at issue is set forth below:

| | |
|---|---|
| David Deitsch | .0001 percent |
| Sara Deitsch | .0001 percent |
| Mordecai Deitsch | 20 percent |
| Joseph Deitsch | 20 percent |
| Rachel Sandman | 19.999 percent |
| B. Mayer Zeiler | 20 percent |
| Jacob Pinson | 20 percent |

(Again, we note that the stipulated values total only 99.9992 percent.)

Financing for the startup of FIL was provided through the Industrial Development Bank of Israel, Ltd., an Israeli governmental organization.  To obtain financing of this type, the Deitsches were required to comply with conditions designed by

Israeli officials to ensure that adequate backing existed for the investment.  In order to satisfy such requirements, two agreements were entered by DPC during 1975.  DPC agreed to purchase at least 60 percent and up to 80 percent of FIL's production until the loan was repaid.  DPC also executed a License, Technical and Marketing Assistance Agreement in which it contracted to provide FIL with technical and marketing information in connection with the setup and operation of the flocked fabrics enterprise.  The document further recited that Pervel Industries, Inc. (Pervel), had in turn agreed to aid DPC in supplying the requisite technical assistance and know-how.  This contract with Pervel, a U.S. manufacturer of flocked fabrics, had been obtained in order to address the fact that differences in the flocked fabric and plastic laminate industries rendered DPC without sufficient expertise to advise FIL on certain technical aspects of the business.

In preparation for the commencement of the FIL operations, Jacob Pinson spent several months in Israel performing such tasks as negotiating for utility services and finalizing the installation of machinery.  Thereafter, B. Mayer Zeiler arrived in Israel and has since been the member of the Deitsch family residing in Kiryat Malachi and running the FIL business.  His job description as an employee of DPC states that he "is responsible for all financial, administrative, sales, and production

functions as they relate to the products sold to and purchased from Flocktex Industries, Ltd." His enumerated duties include:

1.  Responsibility for the sales and purchases relating to Israeli and European markets.

2.  Sales negotiation and procurement of products sold to Flocktex, including relations with its customers in an effort to maintain market presence.

3.  Purchasing negotiations regarding product purchases from Flocktex, Ltd.

4.  Application of expertise regarding selling, purchasing, and other business matters particular to middle east and European market.

5.  Representative to maintain marketing presence.

All other members of the family resided in the United States throughout the period at issue.

On January 14, 1980, DPC and FIL entered an agreement superseding the 1975 License, Technical and Marketing Assistance Agreement, wherein DPC contracted to furnish to FIL the following services:

1.1  Market research in the United States for the product manufactured by FLOCKTEX, provided that FLOCKTEX shall notify DEITSCH in advance of any of these products which it is willing and able to manufacture for export.

2.1  [sic] Sales promotion services, namely, introduction to potential purchasers, promotion through DEITSCH salesmen and dissemination of information and data.

1.3  Advice and recommendation concerning the future development of the manufacture, production and marketing.

     1.4  Counsel regarding the economic purchase of raw
          materials.

     1.5  Warehousing of the products in the United States.

In return, DPC was to receive 15 percent of the net price of the products exported by FIL.  The agreement further stated that it could be terminated by either party with 30 days' written notice.

From 1980 through 1989, DPC reported the payments received from FIL under this agreement on its corporate income tax returns.  Then, by a letter dated January 9, 1990, FIL notified DPC that it was terminating the 1980 agreement, effective in 30 days.  The decision to end the agreement was made because, after approximately 1986, FIL relied upon markets developed in Europe for its product.  FIL did, however, continue to purchase raw materials from Deitsch International Sales Corporation (Deitsch Sales), a U.S. corporation also owned by the Deitsch family.  Deitsch Sales obtained the materials from suppliers in the United States and then sold and exported them to FIL at a profit.  After the 1990 letter, FIL also continued to make payments of 15 percent of the net price of its exported products, but DPC was no longer the sole recipient.  DPC was paid $662,500 in 1990 and last reported "consulting income" under the 1980 agreement on its 1991 return in the amount of $189,995.  The table below summarizes FIL's sales pattern for the years 1978 through 1994, as stipulated by the parties:

| Year | U.S. and Canadian Sales | Other Sales | Total Sales |
|------|------------------------:|------------:|------------:|
| 1978 | $464,786 | $635,399 | $1,100,185 |
| 1979 | 946,456 | 1,076,376 | 2,022,832 |
| 1980 | 1,688,033 | 1,198,674 | 2,886,677 [sic] |
| 1981 | 2,288,980 | 959,419 | 3,248,399 |
| 1982 | 1,634,377 | 459,995 | 2,094,332 [sic] |
| 1983 | 1,266,613 | 1,933,287 | 3,200,000 [sic] |
| 1984 | 231,696 | 2,395,812 | 2,627,508 |
| 1985 | 79,832 | 3,499,999 | 3,579,831 |
| 1986 | 0 | 4,433,073 | 4,433,073 |
| 1987 | 12,796 | 6,748,714 | 6,761,510 |
| 1988 | 10,876 | 10,105,617 | 10,116,496 [sic] |
| 1989 | 0 | 8,801,212 | 8,801,321 [sic] |
| 1990 | 10,485 | 11,314,441 | 11,324,926 |
| 1991 | 0 | 12,728,255 | 12,728,255 |
| 1992 | 16,698 | 16,580,935 | 16,597,633 |
| 1993 | 0 | 17,236,134 | 17,236,134 |
| 1994 | 23,158 | 15,094,572 | 15,117,730 |

## Deitsch Plastic Partners

DPP was formed by members of the Deitsch family in 1990. The entity was organized as a general partnership and had no written partnership agreement.  Partnership interests were divided as follows for the 1991 through 1994 years:

| | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|
| David Deitsch | 25 percent | 20 percent | 16.66 percent | 16.66 percent |
| Mordecai Deitsch | | 20 percent | 16.66 percent | 16.66 percent |
| Joseph Deitsch | 25 percent | 20 percent | 16.66 percent | 16.66 percent |
| Joshua Sandman | 25 percent | 20 percent | 16.66 percent | 16.66 percent |
| B. Mayer Zeiler | | | 16.66 percent | 16.66 percent |
| Jacob Pinson | 25 percent | 20 percent | 16.66 percent | 16.66 percent |

During the years at issue, DPP received no capital contributions from any partner, held no formal partnership meetings at which minutes were maintained, and had no employees. DPP's stated address was identical to that of DPC.

Beginning in 1990, DPP received from FIL payments equaling 15 percent of the net price of FIL's exported products, less the sums described above as remitted to DPC in 1990 and 1991. The payments were made by wire transfer from FIL into bank accounts maintained by DPP in the United States and England. DPP did not, however, enter any written contracts or agreements with FIL regarding these amounts and performed no services for FIL.

DPP was included as an affiliated entity for purposes of the combined financial statements prepared for "Deitsch Plastic Company, Inc. and Affiliates". The payments received from FIL were reported in the financial statements as "Consulting Income". An accompanying note for years 1991 through 1993 explained: "All consulting income was earned from Flocktex Industries Limited, Inc." A similar note with respect to 1994 read: "All consulting income was from Flocktex."

DPP filed a Form 1065, U.S. Partnership Return of Income, for each of the taxable years in contention. Thereon, DPP listed its principal business activity as "consulting" and its principal product or service as "plastics". DPP's reported gross receipts consisted solely of the payments from FIL. The spaces for type

of income on DPP's attached Schedules K, Partners' Shares of Income, Credits, Deductions, Etc., were completed with the word "consulting". DPP also deducted from its income "commissions" paid to B. Mayer Zeiler of $75,000, $75,000, and $400,000 for the years 1992, 1993, and 1994, respectively. B. Mayer Zeiler also continued to receive a salary from DPC.

The individual partners reported their distributive shares of DPP's income on their Forms 1040, U.S. Individual Income Tax Return, and accompanying Schedules E, Supplemental Income and Loss. The amounts were reflected as income or loss from partnerships but were not included on the partners' Schedules B, Interest and Dividend Income.

For the 1991 year, the income was shown as nonpassive. The description of the nonpassive activity given in the returns of David Deitsch, Joseph Deitsch, and Joshua Sandman is "consulting", and the amounts were designated as self-employment earnings on the returns of Joseph Deitsch, Joshua Sandman, and Jacob Pinson. In 1992, David Deitsch again reported his distributive share as nonpassive income, this time with the description "trade or business--material participation". The other partners categorized their 1992 DPP income as passive, and in subsequent years all partners, except B. Mayer Zeiler, utilized the passive designation. They continued, however, to label the income as self-employment earnings in the following

instances:  Joshua Sandman in 1992 and 1994, Jacob Pinson in 1992 and 1994, David Deitsch in 1994, Mordecai Deitsch in 1994, and Joseph Deitsch in 1994.  B. Mayer Zeiler reported his share as nonpassive income from "trade or business--material participation" in both 1993 and 1994, and as self-employment earnings in 1994.

With the exception of B. Mayer Zeiler, all partners included their distributive shares of DPP's gross income as part of their foreign source income for the 1991, 1993, and 1994 years.  They typically categorized this income as "General limitation income" for purposes of the Forms 1116, Foreign Tax Credit, filed with their returns.  For 1993, however, Mordecai Deitsch and Jacob Pinson categorized the amounts as "Passive income".  David Deitsch followed the practice of deeming the payments foreign source income for 1992 as well, while the other partners placed their 1992 distributive shares among their U.S. source income.

FIL, on its financial statements and tax returns for 1991 through 1994, reported the payments to DPC and DPP as "selling expenses".  FIL's financial statements explain the payments in the following language:  "The Company paid the sum of * * * [amount in New Israeli Shekels] to an affiliated company in respect of sales commission and marketing and storage expenses", or "The Company paid the sum of * * * [amount in New Israeli Shekels] to an affiliated company in respect of sales and

marketing commission."  The financial statements do not show dividends as having been paid to shareholders.  The Israeli tax returns reflect a deduction for these expenses and likewise do not show any amount as having been paid as a dividend to shareholders.  No taxes were withheld or remitted to the State of Israel on the payments to DPC and DPP.

The Special Commissions

Commencing in 1987, FIL also began making payments by wire transfer directly to accounts in the name of "Flocktex shareholders".  For the years at issue, the recipients and amounts of these payments are set forth below:

|                   | 1991      | 1992        | 1993 | 1994        |
|-------------------|-----------|-------------|------|-------------|
| David Deitsch     | $875,000  | $2,350,000  | $0   | $1,000,000  |
| Mordecai Deitsch  | 0         | 0           | 0    | 0           |
| Joseph Deitsch    | 875,000   | 2,350,000   | 0    | 1,000,000   |
| Rachel Sandman    | 875,000   | 2,350,000   | 0    | 1,000,000   |
| B. Mayer Zeiler   | 0         | 0           | 0    | 0           |
| Jacob Pinson      | 875,000   | 2,350,000   | 0    | 1,000,000   |

Through withholding, income taxes were paid by the recipients to the State of Israel on the amounts shown above.  Letters issued by Israeli authorities certifying receipt of the income taxes specify that the sums were due in respect of "commission fees" from FIL.

On its financial statements, FIL again classified these payments as "selling expenses" and included the following explanation:  "In accordance with an agreement with the Company's

shareholders the Company paid them a special commission in the amount of * * * [a sum in New Israeli Shekels]."  (Hereinafter, we shall for convenience adopt this terminology and shall refer to these payments from FIL as special commissions.)  The special commissions were also deducted as selling expenses by FIL for purposes of its Israeli tax returns.

The individual recipients reported the special commissions on the line of their income tax returns designated "Other income".  They also attached statements further describing this other income as "commission income Flocktex Ind" or simply "Flocktex Ind" (with various terms and abbreviations being used for Industries).  They did not report the amounts as dividends on their Schedules B.  For each of the years that special commissions were paid, the sums were included as foreign source income in the "General limitation income" category.  Statements accompanying their Forms 1116 for 1991 additionally identify the income as derived from a "business or profession".  The recipients claimed foreign tax credits on their 1991, 1992, and 1994 returns for the Israeli taxes withheld by FIL on the special commissions.

The Other Deitsch Entities

Members of the Deitsch family also conducted business and investment dealings through other partnerships and S corporations during the period at issue.  In particular, the family members

carried on real estate rental activities through a variety of passthrough entities.  The Federal income tax returns of individuals involved in these ventures reported the income or loss therefrom on Schedules E.  Dividends from these entities, as well as from Deitsch Sales, were reflected as "Dividend income" on their Forms 1040 and the accompanying Schedules B.

The Preparation and Examination of the Deitsch Returns

The combined financial statements and the tax returns for DPC, DPP, Deitsch Sales, and various real estate entities were prepared by the accounting firm of Weinstein & Anastasio, P.C. The tax returns here at issue of individual members of the Deitsch family were also prepared by the firm.  Anthony Valentino, a certified public accountant, has been petitioners' primary accountant at the firm since the mid-1980's.  The financial statements and tax returns for FIL were prepared by petitioners' accountant in Israel, Itzhak Timor.

For purposes of preparing these documents, Mr. Valentino was given access to the records for the Deitsch entities kept at the corporate facility in West Haven.  The individual family members, although they did not typically fill out the annual questionnaire sent by the accounting firm, would provide original data such as Forms W-2 and Forms 1099.  Information regarding the payments from FIL was obtained from the FIL financial statements sent to

Mr. Valentino by Mr. Timor.  The intent of Weinstein & Anastasio in reporting these payments was "to be consistent with the reporting that was presented to us by Flocktex."

Preparation of petitioners' tax returns was frequently completed with little time remaining before the filing deadline. It was not uncommon for family members to sign the returns without reviewing or discussing the items therein with their accountant.  Petitioners relied on Mr. Valentino for the accuracy of their returns.

FIL's tax returns were examined by the Israeli taxing authorities for the years 1991, 1992, and 1993.  Examination by the Internal Revenue Service (IRS) of the domestic returns began in 1993, and the audit was eventually expanded to include the 1991 through 1996 years.  During the examination process, IRS agents conducted several interviews with members of the Deitsch family.  Also pursuant to the audit, the IRS in January and November of 1998 sent letters to Israel's Ministry of Finance requesting information on the nature of the payments from FIL.

In a reply dated September 8, 1999, which addressed the 1994 to 1996 years, the Ministry of Finance stated:  "All Payments made by Flocktex to Deitsch Plastic are written as an expense to Flocktex.  Flocktex did not pay Dividends to shareholders in the

years 1994-1996, but instead paid a special commission." The letter continued, specifically in response to inquiries about the payments to DPP, with the following:

> The payments described were reported and deducted, following the tax commisioners' [sic] inquiry, the company's representations and ultimately an agreement reached by the two parties, as consulting fees. There has been no change in this position in the company's reports. The deduction was not removed and the taxable income remained as before. The agreement included, however, additional taxation of these payments prior to the Tax Commissioners [sic] permit to transfer these funds abroad. Therefor, [sic] it seems that in terms of Israeli taxation, there could be no adjustments made at this point and there would be no effect on Israeli taxation as a result of the adjustments made in the U.S.

Then, in answer to questions regarding the special commissions, the taxing authorities provided that "These payments were reported and deducted as described above."

After receiving this communication, the IRS sent an additional letter requesting from the Israeli administration the further specific assistance set forth below:

> (a) Confirm that, similar to 1994-1996, for 1991-1993, FIL did not pay any dividends to shareholders.
>
> (b) Explain which entity you mean by the name "Deitsch Plastic". Does it mean Deitsch Plastic <u>Company</u> or Deitsch Plastic <u>Partners?</u> Does it recognize that these are two separate companies? Provide any information submitted by FIL and/or its accountants explaining its relationship to Deitsch Plastic <u>Company</u> and Deitsch Plastic <u>Partners</u>.

(c)  Irrespective of whether you understand the entity receiving the funds to be Deitsch Plastic <u>Company</u> or Deitsch Plastic <u>Partners</u>, please explain your understanding of the work performed to earn the funds received from FIL.

        *    *    *    *    *    *    *

(e)  Explain your understanding of the work performed by the shareholders to earn the special commissions.  Please provide any documentation supporting this understanding.

The October 14, 1999, response from Israel's Ministry of

Finance reads:

These are the answers from the Assessing Office:

(a)  Flocktex did not pay dividends to shareholders in the years 1992-1993, but instead paid a special commission.

     Files or reports for the 1991-tax year are unobtainable at such short notice.  We requested this information and would be able to complete our answer upon its arrival.

(b)  The Assessing Officer does not distinguish between the two separate companies.

(c)  The taxpayers contended that the payments were for services rendered in form of management and consulting services.  The Israeli company reported the payments as such.  There was no question that management services have actually been given.

     Examination of the work performed to earn this income was not pursued any further.

(e)  As in (c) above.

OPINION

I.  Contentions of the Parties

    A.  Petitioners' Position

Petitioners primarily contend that both the special commissions paid by FIL directly to members of the Deitsch family and the payments from FIL to DPP are properly characterized as dividend income from a foreign source.  Petitioners maintain that the nature or substance of the payments must be determined in accordance with U.S. tax principles and that labels affixed for Israeli reporting purposes are not conclusive.

With respect to the special commissions, petitioners claim dividend treatment is appropriate because no services were rendered by the recipients to FIL and because the amount of the payments was so large as to make it unreasonable to view them as compensation.  Regarding the payments to DPP, petitioners aver that because the agreement under which such sums were paid to DPC for services was terminated prior to the years in issue, and because DPC in fact provided no services to FIL during the 1991 through 1994 period, the payments were properly reported as income to DPP.  Furthermore, it is petitioners' position that since neither DPP nor the individual family members performed services for FIL (with the exception of B. Mayer Zeiler who was

otherwise compensated therefor), the payments constitute dividends from a foreign source received by DPP on behalf of the shareholder-partners.

Based then on the above characterizations as foreign source income, petitioners assert that they are entitled to foreign tax credits for the taxes paid to the Israeli Government on the special commissions and that both types of payments are to be included in calculating the amount of the credits. In the alternative, if the claimed credits are reduced or disallowed, petitioners seek a deduction for foreign taxes paid.

Lastly, petitioners dispute application of the section 6662(a) penalty on the grounds that they acted reasonably and in good faith in relying on a professional tax adviser, with respect to complex matters.

B. Respondent's Position

Conversely, respondent asserts that petitioners' characterizations impermissibly seek to reduce U.S. income taxes through improper claiming of foreign tax credits and assigning of income among entities. Concerning the special commissions, respondent maintains that petitioners should not be permitted to depart from the position repeatedly taken for both U.S. and Israeli reporting purposes that the amounts represented compensation for services. Moreover, since no recipient

performed work for FIL outside of the United States during the years in issue, respondent avers that the payments constitute U.S. source income.

As regards the payments to DPP, respondent again contends that petitioners should be bound by their representations that such sums were in the nature of compensation for services. Respondent further argues, however, that the funds are properly characterized as income to DPC, not DPP. In respondent's view, the alleged termination of the 1980 assistance agreement and the creation of DPP were merely a scheme to eliminate corporate level tax, unaccompanied by actual change in the entities' relationship and evidenced through continued adherence to the 15-percent payment formula. Hence, according to respondent, the amounts reported by individual family members must be viewed as constructive dividends from DPC and, consequently, as U.S. source income from a domestic corporation.

Given the above designation of both types of payments as U.S. source income, respondent disallows petitioners' claimed foreign tax credits. Respondent also denies such credits on the alternative basis that petitioners have failed to establish that the Israeli withholding is a creditable tax. In addition, respondent argues that DPC is liable for corporate level tax on the amounts reported by DPP.

Finally, respondent alleges that petitioners' improper attempts to manipulate the Internal Revenue Code, inconsistent reporting and statements, and failure to review their returns render them liable for the section 6662(a) accuracy-related penalty.

## II.  Proper Tax Treatment of Payments

### A.  General Rules

#### 1.  Foreign Taxes and Sources of Income

Payment of taxes to a foreign Government may give rise to either a deduction or a credit.  See secs. 164, 901.  Section 164(a)(3) provides that a deduction is allowed for foreign income taxes.  In lieu of this deduction, section 901(a) and (b)(1) permits a taxpayer to elect a credit for foreign income taxes which meet the requirements set forth in the statute and the regulations promulgated thereunder.  Section 904(a), however, places the following limitation on the amount of the foreign tax credit:

> The total amount of the credit taken under section 901(a) shall not exceed the same proportion of the tax against which such credit is taken which the taxpayer's taxable income from sources without the United States (but not in excess of the taxpayer's entire taxable income) bears to his entire taxable income for the same taxable year.

To determine the source of income, reference must be made to the source rules enumerated in sections 861 and 862.  Section 861(a)(2)(A) and (3) states that, in general, dividends from a

domestic corporation and compensation for labor or personal services performed in the United States are to be treated as income from sources within the United States. Conversely, section 862(a)(2) and (3) specifies that dividends other than those derived from sources within the United States under section 861(a)(2) and compensation for labor or personal services performed without the United States are to be treated as income from without the United States. Thus, payment for services rendered outside the United States and dividends from a foreign corporation typically constitute foreign source income for purposes of calculating the section 901 credit.

In the instant matter, the parties apparently do not dispute these basic principles. They disagree, however, as to the characterization of the payments at issue and, therefore, as to the source from which they must be deemed to flow.

### 2. Form and Substance of Transactions

In characterizing a payment for tax purposes, consideration must often be given to ideas of substance and form and to the proper resolution of any dichotomy between the two. As a general rule, the substance of a transaction controls tax treatment. See Gregory v. Helvering, 293 U.S. 465, 469-470 (1935). Nonetheless, where either the Commissioner or a taxpayer seeks to assert the substance of a transaction over its form, his or her respective ability to do so differs. See Commissioner v. National Alfalfa

Dehydrating & Milling Co., 417 U.S. 134, 148-149 (1974); Gregory

v. Helvering, supra at 467-470; Norwest Corp. v. Commissioner,

111 T.C. 105, 145 (1998); Estate of Durkin v. Commissioner, 99

T.C. 561, 571 (1992).

It is well settled that the Commissioner may both look

behind the form of a transaction to its substance, see Gregory v.

Helvering, supra at 467-470, and bind a taxpayer to the form in

which the taxpayer has cast a transaction, see Commissioner v.

National Alfalfa Dehydrating & Milling Co., supra at 149. See

also Estate of Durkin v. Commissioner, supra at 571. As stated

by the Court of Appeals for the Second Circuit, to which appeal

in these cases would normally lie,

> The Commissioner is justified in determining the tax
> effect of transactions on the basis in which taxpayers
> have molded them, although he may not always be
> required to do so. It would be quite intolerable to
> pyramid the existing complexities of tax law by a rule
> that the tax shall be that resulting from the form of
> transaction taxpayers have chosen or from any other
> form they might have chosen, whichever is less.
> [Television Indus., Inc. v. Commissioner, 284 F.2d 322,
> 325 (2d Cir. 1960), affg. 32 T.C. 1297 (1959);
> citations omitted.]

A taxpayer, in contrast, "may have less freedom than the

Commissioner to ignore the transactional form that he has

adopted." Bolger v. Commissioner, 59 T.C. 760, 767 n.4 (1973);

see also Norwest Corp. v. Commissioner, supra at 145; Estate of

Durkin v. Commissioner, supra at 571; Coleman v. Commissioner, 87

T.C. 178, 201-202 (1986), affd. without published opinion 833

F.2d 303 (3d Cir. 1987). In determining whether a taxpayer may attempt to disavow the form adopted for a transaction, this Court has considered at least four factors: (1) Whether the taxpayer seeks to disavow his or her own tax return treatment for the transaction; (2) whether the taxpayer's tax reporting and other actions show an honest and consistent respect for the alleged substance of the transaction; (3) whether the taxpayer is unilaterally attempting to have the transaction treated differently after it has been challenged; and (4) whether the taxpayer will be unjustly enriched if permitted to alter the transactional form. See Taiyo Hawaii Co. v. Commissioner, 108 T.C. 590, 601-602 (1997); Estate of Durkin v. Commissioner, supra at 574-575; FNMA v. Commissioner, 90 T.C. 405, 426-427 (1988), affd. 896 F.2d 580 (D.C. Cir. 1990); Illinois Power Co. v. Commissioner, 87 T.C. 1417, 1430 (1986); Little v. Commissioner, T.C. Memo. 1993-281, affd. 106 F.3d 1445 (9th Cir. 1997); Norwest Corp. v. Commissioner, supra at 144-146.

If a taxpayer is not precluded from arguing that substance, as opposed to form, should control tax consequences, he or she must then establish the claimed substance of the transaction under a heightened burden of proof. See Norwest Corp. v. Commissioner, supra at 140, 144; Estate of Durkin v. Commissioner, supra at 572-574; Illinois Power Co. v. Commissioner, supra at 1434; Little v. Commissioner, supra. This

Court typically applies the "strong proof" rule unless appeal would lie to a Court of Appeals which has adopted the more restrictive rule of Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965). See Estate of Durkin v. Commissioner, supra at 572-573; Illinois Power Co. v. Commissioner, supra at 1434; Little v. Commissioner, supra. The strong proof standard requires the taxpayer to present more than a preponderance of the evidence in support of his or her characterization. See Ullman v. Commissioner, 264 F.2d 305, 308-309 (2d Cir. 1959), affg. 29 T.C. 129 (1957); Illinois Power Co. v. Commissioner, supra at 1434 n.15; Little v. Commissioner, supra. Alternatively, where a taxpayer is not attempting to disavow form, his or her burden of proof is to establish by a preponderance that respondent's determinations are incorrect. See Rule 142(a).

B.  The Special Commissions

Given the principles described above, we begin our analysis of the special commissions with the threshold inquiry of whether petitioners are attempting to assert substance over form. Petitioners state on brief:

> The petitioners take issue with the premise * * * that the petitioners are seeking to disavow the form of the transaction that they originally adopted. In fact, the only "form" to the special commission payments was wire transfers of the money to the petitioners. The petitioners are not seeking to change the form of the transactions but are merely asking the Court to properly characterize the payments in accordance with

the objective facts, notwithstanding the labels that were attached to the payments for Israeli tax and reporting purposes. * * *

They then cite United States v. Goodyear Tire & Rubber Co., 493 U.S. 132 (1989), and LDS, Inc. v. Commissioner, T.C. Memo. 1986-293, as support for their position.

We conclude, however, that petitioners by this statement essentially concede that the payment transactions were previously presented with a "form" or "label" other than dividend distribution. We further note that their reliance on the cited cases to minimize the importance of this fact is misplaced. United States v. Goodyear Tire & Rubber Co., supra, simply decided that the statutory term "accumulated profits" should be defined according to domestic tax principles and did not raise or consider a taxpayer's ability to disavow form. LDS, Inc. v. Commissioner, supra, addressed whether transfers of property to a corporation constituted debt or capital contributions and explicitly confined willingness to look beyond "labels" to this narrow context. The Court explained: "'where the nature of a taxpayer's interest in a corporation is in issue, courts may look beyond the form of the interest and investigate the substance of the transaction. These situations present an exception to the general proposition that a shareholder/taxpayer is bound by the form of her transaction.'" Id. (quoting Selfe v. United States, 778 F.2d 769, 774 (11th Cir. 1985)). Similarly, "'while a

taxpayer must in other contexts accept the tax consequences of the way in which he deliberately chose to cast his transaction,' the determination of whether advances to a corporation are loans or equity contributions depends on the 'economic reality for the year at issue.'" Id. (quoting Georgia-Pacific Corp. v. Commissioner, 63 T.C. 790, 795 (1975)). LDS, Inc. v. Commissioner, supra, thus in actuality reaffirms that where, as here, the characterization of advances to a corporation as debt or equity is not at issue, taxpayers are typically bound by form and labels.

Having determined that petitioners are seeking to make a substance over form argument, we turn to the question of whether they should be permitted to do so. We consider the circumstances of these cases in light of the aforementioned factors.

With respect to tax return treatment, petitioners reported the special commissions as "Other income" on their Forms 1040. If any explanation which went beyond simply identifying FIL as the payer was included on the attached statements, the description so given was "commission income". A commission is generally defined as "a fee paid to an agent or employee for transacting a piece of business or performing a service". Webster's Third New International Dictionary 457 (1976). Conversely, petitioners never reported the income on the line of

their Forms 1040 designated for dividend income, nor did they ever list the payments as dividends on their Schedules B, although amounts from other Deitsch entities were reflected thereon.

Petitioners did include the sums paid as foreign source income on their Forms 1116 for purposes of calculating the foreign tax credit, but they indicated on these forms that their foreign source income fell within the "General limitation income" category. We note that the instructions for Form 1116 specify: "Any income from sources outside the United States that does not fall into one of the categories above is general limitation income. Common examples of general limitation income are wages, salary, and overseas allowances of an individual as an employee." Further, among the "categories above" is "Passive income", a choice not selected by petitioners on their Forms 1116. The instructions state that "Passive income generally includes dividends, interest, royalties, rents, [and] annuities".

Petitioners' tax return treatment is thus largely consistent with the special commissions being in the nature of compensation for services but seems to negate any conclusion that petitioners were receiving dividends. Their present claims of distributions of earnings and profits are therefore far more akin to a disavowal of their tax return treatment than to an affirmance.

The broader inquiry of whether petitioners' tax reporting and other actions show an honest and consistent respect for the transactions' alleged substance likewise demands an answer unfavorable to petitioners' position. In addition to their own return treatment, the returns of FIL, which was at all times wholly owned and controlled by the individual petitioners and run by B. Mayer Zeiler, never reported a dividend. Rather, deductions were taken for the amounts transferred. FIL's financial statements similarly designate the payments "selling expenses" and explain that the company paid shareholders "a special commission".

Moreover, those acting on FIL's behalf apparently made representations to Israeli authorities directly contrary to the position advocated here. Documentation from Israel's Ministry of Finance reads: "The taxpayers contended that the payments were for services rendered in form of management and consulting services. The Israeli company reported the payments as such. There was no question that management services have actually been given." The taxing authorities were convinced that "Flocktex did not pay dividends to shareholders * * * but instead paid a special commission." Similarly, the IRS agent conducting interviews with petitioners during the subsequent domestic audit, whom we find credible, testified that when he inquired in January of 1994 what the special commissions were for, Joseph Deitsch

"explained to me that there were services being performed by the 1040s--I mean the individuals when I say the 1040s--to achieve these special commissions."

An additional circumstance which weighs against a finding that actions respected dividend substance is the fact that the distributions bear little correlation to stockholdings. Mordecai Deitsch and B. Mayer Zeiler, both of whom held 20-percent ownership interests in FIL, received no special commissions during the years at issue. Other 20-percent shareholders were each paid the full $875,000 to $2,350,000 commission amount. In contrast, David Deitsch, who was a .0001-percent owner, also received the full $875,000 to $2,350,000 commission amount. Yet Sara Deitsch, likewise a .0001-percent owner, received no payment. Since a dividend is typically understood as a "distribution * * * to the shareholders of a corporation pro rata based on the number of shares owned", Black's Law Dictionary 478 (6th ed. 1990), petitioners' position is at least weakened by the arbitrary dispersal of the special commissions. Hence, there is nothing in the record which leads us to conclude that the actions of the individual petitioners or their entities show an honest and consistent respect for the alleged dividend substance of the disputed payments.

As regards a unilateral change of position after challenge, the examining agent further testified: "It was in the May 5th

[1994] interview that special commissions were represented as actually dividends.  Up to that point, we were under the impression that there was some type of consulting income going on."  Furthermore, since no documentation relating to the transactions ever characterized the payments as dividend income, and since this treatment was clearly not pursued in the earlier Israeli examination, we are satisfied that respondent's challenge motivated petitioners to advance their present theory.

Lastly, as sole owners of FIL, petitioners did obtain some benefit or enrichment from the corporation's deduction, which left greater funds available for use and distribution.

When we compare these inconsistencies with the situations presented in cases where taxpayers were precluded from arguing substance over form, we believe that like treatment is warranted here.  For instance, in Norwest Corp. v. Commissioner, 111 T.C. at 145-146, 147, we acknowledged that our approach might forsake the true substance of the transaction but stated:  "when a taxpayer seeks to disavow its own tax return treatment of a transaction by asserting the priority of substance only after the Commissioner raises questions with respect thereto, this Court need not entertain the taxpayer's assertion of the priority of substance."  We refused to become embroiled in the taxpayer's post-transactional tax planning.  See id. at 147.  We likewise opined in Little v. Commissioner, T.C. Memo. 1993-281, that "when

raising a substance over form argument, the taxpayer must have 'clean hands' before he is allowed to present strong proof that the form chosen does not reflect the true substance of the transaction."

Similarly, <u>Coleman v. Commissioner</u>, 87 T.C. 178 (1986), stands for the proposition that the above principles lose none of their relevance in an international context.  We reasoned therein:

> The fact that the purpose underlying the form of the transactions between * * * [foreign parties involved in an equipment leasing transaction, one of which was the party from whom the U.S. taxpayers derived their interest in the scheme] was to take advantage of U.K. rather than U.S. tax laws does not, in our opinion, provide a sufficient foundation for permitting petitioners to disavow that form in order to obtain the benefits of U.S. tax laws. * * * [<u>Id.</u> at 202-203.]

Given the foregoing, we hold that petitioners are bound by the various representations that these payments constituted commission or consulting income, rather than dividends.  Further, since the record is devoid of any evidence that the recipients were residing or working outside the United States during the years at issue, we decide that the sums must be treated as compensation for services performed in the United States and, hence, as U.S. source income.  Petitioners are not entitled to treat the special commissions as foreign source income for purposes of calculating foreign tax credits.

C. The Payments to DPP

Turning to the payments from FIL to DPP, we first observe that both petitioners and respondent seek to diverge to some degree from the "form" or apparent import of the documentary record. Petitioners assert that the payments were properly included as income of DPP but should be treated as dividends from FIL for purposes of computing their foreign tax credits. Although no Israeli taxes were withheld on these payments, their characterization as U.S. or foreign source income is significant in that the amount of the foreign tax credit available for taxes that were paid depends upon the overall proportion of U.S. to foreign source income. Respondent avers that the amounts should be treated in accordance with representations that they constituted compensation for services but that such income was earned by and taxable to DPC, rather than DPP, and was received by petitioners as a constructive dividend from DPC.

Nonetheless, the parties have stipulated that if we find the payments from FIL "were properly reported by DPP", petitioners will be permitted to treat them as dividends from FIL. We therefore begin with this issue, but we note our reservations about the seeming facial inconsistency of this statement. Since DPP reported the amounts as "Ordinary income (loss) from trade or business activities" on its Forms 1065, and listed the type of income as "consulting" on the attached Schedules K, treatment as

a dividend appears contrary to a finding of proper reporting. This concern becomes moot, however, in that we fail to see how the payments from FIL can on this record be deemed "properly reported" by DPP either as compensation or as dividends.

The parties stipulated that DPP performed no services for FIL. This implies that any consulting services rendered to FIL by members of the Deitsch family were not performed in their capacity as partners of DPP. DPP thus cannot be said to have earned income from the business activity of consulting. With respect to dividends, DPP was at no time a shareholder in FIL. Hence, if the income in question represents dividends to shareholders, it is properly reportable only by those stockholders, not by an entity to whom they never transferred even nominal title to their shares. We find that the payments from FIL were not properly reported by DPP.

### 1. Characterization of the Payments

Having determined that a particular treatment is improper, we proceed to address proper treatment. To do so, we must consider both how the payments from FIL are to be characterized and by whom they are to be reported. As regards characterization, petitioners maintain on brief that the DPP payments "were intended as distribution of profits to Flocktex shareholders". They then state: "the classification of the payments as commission by the Israeli accountant is not

conclusive as to whether the payments were compensation for services. The payments constitute dividends for U.S. tax purposes." We, however, again decline any invitation by petitioners to engage in a substance over form analysis. For reasons which parallel those discussed above, we find that petitioners are not entitled to now advance a position that conflicts with the paper trail they have created.

Petitioners' tax returns reflect the payments to DPP as partnership income, and attached Schedules E in some years designate the income as nonpassive and in others as passive. Descriptions of "consulting" or "trade or business--material participation" are typically included in those years where a nonpassive classification is shown, and even in a number of years where the income is marked passive, it is nevertheless labeled self-employment earnings. Section 1402(a) defines "net earnings from self-employment" as "the gross income derived by an individual from any trade or business carried on by such individual," less allowable deductions, plus the individual's distributive share from any trade or business carried on by a partnership. However, the statute explicitly provides that "in computing such gross income and deductions and such distributive share of partnership ordinary income or loss * * * there shall be excluded dividends on any share of stock". Sec. 1402(a), (a)(2).

Petitioners also never reported the amounts as dividends on their Schedules B, although as noted previously, sums from other of their partnership entities were so listed.

Further, with few exceptions petitioners' returns inexplicably characterize the DPP income as derived from a foreign source in 1991, 1993, and 1994, but not in 1992. Moreover, the returns claiming foreign source treatment repeatedly place the payments in the "General limitation income" category, rather than in the "Passive income" category. Based on the aforementioned instructions for Form 1116, such a choice is not consistent with the payments' being in the nature of dividends but is appropriate for compensation.

Documentation pertaining to DPP and FIL is similarly devoid of any hint that the payments were dividends as opposed to compensation. Combined financial statements including DPP show the amounts as "consulting income" earned from FIL. In addition, DPP's returns and Schedules K report the payments as "Ordinary income (loss) from trade or business activities" and specify the type of income as "consulting".

FIL likewise reported and deducted the payments as "selling expenses" on its financial statements and tax returns, and no dividend is recorded thereon as having been paid. Furthermore, the conclusions of the Israeli authorities regarding the payments to DPP were identical to those reached about the special

commissions: "The taxpayers contended that the payments were for services rendered in form of management and consulting services. The Israeli company reported the payments as such. There was no question that management services have actually been given."

Lastly, we note that in no year did the partnership interests in DPP mirror shareholdings in FIL. In addition, interests in DPP fluctuated repeatedly while FIL stockholdings remained constant. Such dichotomy undercuts petitioners' argument that DPP was created as a vehicle to distribute earnings and profits to FIL shareholders.

Faced with the foregoing, we will not permit petitioners now to advance a position amounting to a disavowal of tax return treatment, unsupported by any consistent respect in reporting and actions, and subsequent to receipt of a tax benefit in a foreign jurisdiction based upon contrary assertions. We hold that the payments from FIL to DPP must be characterized as compensation for services.

### 2. Earner of the Income

We next consider the question of which party or parties is to be treated as earning, and hence must report, this compensation. Because we have already eliminated DPP, our focus turns to the relative merits of deeming either DPC or the individual petitioners the earners of the income. Respondent has determined that the payments must be allocated to DPC.

Specifically, respondent maintains that DPC in substance continued to render services to FIL under the 1980 assistance agreement, and that the letter of July 1990 formally terminating the agreement should be disregarded. Respondent also relies heavily on the presence and activities of B. Mayer Zeiler in Israel to show that DPC continued to perform the services called for in the 1980 agreement.

We believe, however, that the record in this case establishes the lack of a formal consulting relationship between DPC and FIL. To the extent that the individual petitioners advised FIL, the evidence suggests that they did so informally, on behalf of the Deitsch family, rather than specifically in their capacities as employees of DPC. We base this conclusion on documentary evidence regarding the sales pattern of FIL and the services detailed in the 1980 agreement, as well as on the testimony of petitioners concerning the mode of business operation of the Deitsch family and entities.

Stipulated sales figures for years 1978 through 1994 reveal that of FIL's total sales of $61,679,752 during the 1991 to 1994 period at issue, only $39,856 was derived from sales in the United States and Canada. Moreover, this trend wherein North American sales accounted for a very small percentage of FIL's sales volume was established in the mid-1980's. Yet under the 1980 agreement, two of the five enumerated services to be

furnished by DPC expressly involved operations within the United States, and a third implies as much. FIL's shift away from U.S. markets thus indicates that these functions were no longer being performed.

The specific tasks of "Market research in the United States for the product manufactured by Flocktex" and "Warehousing of the products in the United States" would have become largely unnecessary once FIL ceased marketing or selling any significant portion of its output in the United States. Further, given that DPC was a domestic corporation with a domestic market and sales force, "Sales promotion services * * * through DEITSCH salesmen" implicitly contemplates U.S. activities which would not have been pursued after the shift to European markets. Of the remaining items, we find it reasonable that after approximately 15 years in business, FIL in 1990 would have had a well-established network of suppliers, such that "Counsel regarding the economic purchase of raw materials" would have been minimal at best.

The final task set forth in the 1980 agreement is "Advice and recommendation concerning the future development of the manufacture, production and marketing," and we have precluded petitioners from arguing that no consulting services were performed. However, to the extent that advice continued to flow between petitioners and FIL, we believe testimony revealing the mode of operation within the Deitsch entities shows that such

information was furnished by individuals in their role as family members, not because they were obligated to do so as DPC employees bound by a formal contract.

During trial Joseph Deitsch was asked, "What was the family culture of the Deitsches?" He responded, "Well, what Papa said-- that's what goes. We lived together, worked together, and it was--and there was no question everybody had what they needed, and we--I thought we had a good work ethic, and we tried our best." The following exchange then expanded upon this idea:

> Q. Did this attitude get reflected in other areas of the business?
>
> A. It was a lifestyle reflected in everything which we did, as a family and individuals.
>
> Q. All of the businesses were basically family businesses?
>
> A. Basically, yeah. Everybody worked together. Everybody did. It wasn't for his own, it was for everybody together.

A similar sentiment is apparent in Jacob Pinson's statement that "most of the decisions were done by Mr. David Deitsch, and everybody understood that this was a family business, and everybody would be treated as a family, but the final decision was really Mr. David Deitsch." Likewise, when questioned regarding the existence of communications between patriarch David Deitsch and B. Mayer Zeiler about FIL's affairs, Jacob Pinson said that "there were a lot of communications, family communications."

One further example illustrating the business environment within the Deitsch entities is found in Joseph Deitsch's reply when asked whether DPC had an official research and development department: "Official? No. Everybody wears many hats. So, anybody has an idea, they try to expand. The company is on a first-name basis, no titles."

Hence, on the basis of this record, we conclude that any formal consulting relationship established by the 1980 agreement had ceased prior to issuance of the July 1990 termination letter. For the reasons summarized below, we are satisfied that form was by such letter brought into harmony with substance. First, the majority of the specific services called for in the agreement had been rendered obsolete by FIL's shift away from U.S. markets. Second, to attribute to DPC whatever assistance continued to pass to FIL, by deeming DPC the true earner of the income, would require a finding that the individual petitioners were acting on behalf of DPC when furnishing advice. Such a conclusion, however, is contrary to evidence that petitioners worked primarily for the collective good of the Deitsch family and without regard to corporate roles. We are convinced that status as DPC employees did not motivate their actions in this area. In addition, since nearly all payments after 1990 were made to DPP, not DPC, and because FIL was owned by petitioners in their individual capacities, with DPC having no direct stake therein,

it is unlikely that petitioners saw themselves as discharging corporate duties when counseling the Israeli enterprise.

Furthermore, we reject respondent's argument that B. Mayer Zeiler's presence and activities in Israel show DPC continued to render the services enumerated in the 1980 agreement. B. Mayer Zeiler's job description indicates that his role as a DPC employee with respect to FIL consists of responsibility for managing and running all aspects of the FIL business on a day-to-day basis. The description contemplates active involvement in selling, purchasing, negotiating, and procuring, and testimony reflected the B. Mayer Zeiler does in fact run FIL's daily operations. In contrast, the 1980 agreement calls for services which are advisory or supportive in nature and distinct from active management. Thus, if B. Mayer Zeiler performed any such consulting services for FIL, our grounds for concluding that he did so in his official capacity as a DPC employee are not significantly greater than with respect to the other petitioners.

We therefore hold that the individual petitioners are to be treated as the earners of the consulting income remitted to DPP by FIL, and that they are entitled to claim an appropriate deduction for their pro rata share of DPP's reported expenses. The record fails to support respondent's assertions that such amounts are to be allocated first as income to DPC, then classified as constructive dividends to the individuals. Since

the income is to be treated as compensation to the individuals, we further conclude that payments are U.S. source income to the individual petitioners other than Mr. and Mrs. Zeiler.

### D.  Alternative Availability of Deduction

Without further argument or discussion, petitioners included the following statement in their opening brief:

> if the effect of * * * [the Court's] holdings is to reduce the amount of foreign tax credits available to the petitioners during the years at issue, then, as part of the Rule 155 Computation, the petitioners reserve the right to elect to take a deduction for the stipulated foreign taxes paid in lieu of the foreign tax credit for any or all of such years pursuant to Code § 164(a)(3) and Treas. Reg. § 1.901-1(d).

This issue had not previously been raised through the pleadings or at trial, and respondent objected thereto in his reply brief, asserting that petitioners' claim was not a proper subject for a Rule 155 computation and should have been addressed as part of the merits of the case.  Respondent's opening brief had also contained, within a general discussion of the law relating to the foreign tax credit, the statement that "Once a taxpayer elects to take the credit, section 275(a)(4)(A) prohibits the claiming of the taxes as a deduction."  Petitioners responded to this remark in their reply brief with a single paragraph:

> Moreover, the respondent contends that once a taxpayer elects to take a foreign tax credit, Section 275(a)(4)(A) prohibits the claiming of the taxes as a deduction.  In fact, Treas. Reg. § 1.901-1(d) allows a taxpayer to claim a deduction in lieu of a foreign tax credit at any time before the expiration of the statute

> of limitations prescribed by Section 6511(d)(3)(A), which is generally 10 years from the date of filing of the return.  In the event that the Court holds that either or both the special commission payments and the DPP payments constitute U.S. source income, and such holding or holdings are sustained on appeal or not appealed, the petitioners reserve the right to elect to take a deduction for the stipulated foreign taxes paid in lieu of the foreign tax credit for any or all of the years of the relevant period.

We, however, conclude that petitioners may not reserve such a right in the procedural posture presented.

Petitioners have raised for the first time on brief not only their entitlement to a deduction under section 164 but also an issue of statutory and regulatory interpretation.  It is the well-settled rule of this Court that a matter raised for the first time on brief will not be considered when to do so would prejudice the opposing party.  See DiLeo v. Commissioner, 96 T.C. 858, 891-892 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Markwardt v. Commissioner, 64 T.C. 989, 997 (1975).  Such prejudice arises when the opposing party would be prevented from presenting evidence that might have been offered if the issue had been timely raised, or would otherwise be surprised and placed at a disadvantage.  See DiLeo v. Commissioner, supra at 891-892; Markwardt v. Commissioner, supra at 997.

Here, respondent was denied the opportunity to present evidence concerning whether petitioners satisfied the requirements for a deduction.  Respondent's choices as to which items to stipulate and which to litigate might also have been

affected.  In addition, we find the sentence in petitioners'
opening brief regarding a Rule 155 computation insufficient to
alert respondent of the need to address on the merits the
interplay between section 275(a)(4)(A) and section 1.901-1(d),
Income Tax Regs.

III.  Applicability of the Accuracy-Related Penalty

Subsection (a) of section 6662 imposes an accuracy-related
penalty in the amount of 20 percent of any underpayment that is
attributable to causes specified in subsection (b).  Subsection
(b) of section 6662 then provides that among the causes
justifying imposition of the penalty are:  (1) Negligence or
disregard of rules or regulations and (2) any substantial
understatement of income tax.

"Negligence" is defined in section 6662(c) as "any failure
to make a reasonable attempt to comply with the provisions of
this title", and "disregard" as "any careless, reckless, or
intentional disregard."  Case law similarly states that
"'Negligence is a lack of due care or the failure to do what a
reasonable and ordinarily prudent person would do under the
circumstances.'"  Freytag v. Commissioner, 89 T.C. 849, 887
(1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th
Cir. 1967), affg. on this issue 43 T.C. 168 (1964) and T.C. Memo.
1964-299)), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S.
868 (1991).  Pursuant to regulations, "'Negligence' also includes

any failure by the taxpayer to keep adequate books and records or to substantiate items properly." Sec. 1.6662-3(b)(1), Income Tax Regs.

A "substantial understatement" is declared by section 6662(d)(1) to exist where the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $5,000 ($10,000 in the case of a corporation). For purposes of this computation, the amount of the understatement is reduced to the extent attributable to an item: (1) For which there existed substantial authority for the taxpayer's treatment thereof, or (2) with respect to which relevant facts were adequately disclosed on the taxpayer's return or an attached statement. See sec. 6662(d)(2)(B).

An exception to the section 6662(a) penalty is set forth in section 6664(c)(1) and reads: "No penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." The taxpayer bears the burden of establishing that this reasonable cause exception is applicable, as respondent's determination of an accuracy-related penalty is presumed correct. See Rule 142(a).

Regulations interpreting section 6664(c) state:

> The determination of whether a taxpayer acted with
> reasonable cause and in good faith is made on a case-

by-case basis, taking into account all pertinent facts and circumstances. * * * Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. * * * [Sec. 1.6664-4(b)(1), Income Tax. Regs.]

Furthermore, reliance upon the advice of an expert tax preparer may, but does not necessarily, demonstrate reasonable cause and good faith in the context of the section 6662(a) penalty.  See id.; see also Freytag v. Commissioner, supra at 888.  Such reliance is not an absolute defense, but it is a factor to be considered.  See Freytag v. Commissioner, supra at 888.  In order for this factor to be given dispositive weight, the taxpayer claiming reliance on a professional such as an accountant must show, at minimum, that (1) the accountant was supplied with correct information and (2) the incorrect return was a result of the accountant's error.  See, e.g., Westbrook v. Commissioner, 68 F.3d 868, 881 (5th Cir. 1995), affg. T.C. Memo. 1993-634; Cramer v. Commissioner, 101 T.C. 225, 251 (1993), affd. 64 F.3d 1406 (9th Cir. 1995); Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978); Pessin v. Commissioner, 59 T.C. 473, 489 (1972); Garcia v. Commissioner, T.C. Memo. 1998-203, affd. 190 F.3d 538 (5th Cir. 1999).

As a threshold matter, we first address the situation of DPC.  Due to our determination above that the payments to DPP are not to be allocated as income to DPC, there exists no

underpayment attributable to these items upon which to premise an accuracy-related penalty. We hold that DPC is not liable under section 6662(a).

With respect to the individual members of the Deitsch family (again other than B. Mayer Zeiler, whose penalty liability has been settled by stipulation), petitioners seek to defend against the imposition of section 6662(a) penalties on the grounds of preparer reliance. They maintain that reliance upon their accountant demonstrates the requisite reasonable cause and good faith to relieve them of negligence and to render applicable the section 6664(c) exception. We, however, disagree.

Even if we accept the uncorroborated testimony that petitioners informed Mr. Valentino the payments from FIL were distributions of earnings and profits, the record at best reflects that Mr. Valentino was supplied with inconsistent and contradictory information. Mr. Valentino was faced with written documents, namely FIL's financial statements, reflecting one characterization and with oral assertions reflecting another. In addition, the discrepancies between years and among petitioners indicate that petitioners' representations may have at times been incomplete or even conflicting. Moreover, there is no evidence whatsoever that petitioners provided Mr. Valentino with facts underlying the FIL transactions that would have enabled him to make an independent decision regarding their actual nature.

Since the record before us fails to explain how or why particular individuals were selected to receive the distributed amounts, we believe there exists a reasonable probability that Mr. Valentino was likewise without the benefit of such data. The various aberrations in reporting treatment further support this view that Mr. Valentino may have had a limited understanding of the streams of funds flowing out of FIL.

In these circumstances, we hold that petitioners have failed to prove that their reliance on their accountant was reasonable and in good faith. Petitioners are liable for the section 6662(a) accuracy-related penalties on the alternative grounds of negligence and/or substantial understatement of income tax. Other contentions of the parties have been considered and, to the extent not discussed herein, have been resolved by our determinations above, rendered moot, or found unconvincing.

To reflect the foregoing,

Decisions will be entered
under Rule 155.