153 T.C. No. 3

UNITED STATES TAX COURT

AG PROCESSING, INC. A COOPERATIVE AND SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23479-14.                    Filed October 16, 2019.

P is a nonexempt cooperative subject to the rules under I.R.C. secs. 1381 through 1388 (subch. T). During its taxable years 2006 through 2009 P made payments to its members for products that it processed and marketed for the members. The amounts of the payments were fixed without reference to P's net earnings pursuant to an agreement between P and each member. P received similar payments from a cooperative of which it was a member.

In a private letter ruling issued to P in 2009, the IRS characterized such payments as per-unit retain allocations paid in money (PURPIMs) for purposes of I.R.C. secs. 1382(b)(3) and 1388(f) and for purposes of P's domestic production activities deduction (DPAD) under I.R.C. sec. 199. P reported the payments as PURPIMs in computing its taxable income and treated the payments as PURPIMs in computing its DPAD for its current taxable year, 2009, and its open taxable year under extension, 2008. P also filed amended returns for prior taxable years 2006 and 2007 reporting payments made with respect to those years as PURPIMs and treating them as such in computing its taxable income and DPAD.

R determined that the payments P made to its members did not qualify as PURPIMs for taxable years 2006, 2007, and 2008.  In addition R determined that P, as a nonexempt cooperative, was required to compute two separate DPAD amounts--one for its patronage activities and one for its nonpatronage activities.

Held:  The payments P made to its members and the similar payments P received from a cooperative of which it was a member are PURPIMs for purposes of I.R.C. secs. 1382(b)(3) and 1388(f), and P must treat them as such in computing its DPAD under I.R.C. sec. 199.

Held, further, I.R.C. sec. 199(d)(3) does not require P to compute separate DPAD amounts for its patronage and nonpatronage activities.

Held, further, once DPAD is computed under I.R.C. sec. 199, it must be allocated under the rules of subch. T between P's patronage and nonpatronage accounts.

Held, further, under the general rules of I.R.C. sec. 172(d)(7) P's DPAD cannot be used to create or increase a net operating loss.

George William Benson and Andrew R. Roberson, for petitioner.

Courtney L. Frola and William R. Davis, Jr., for respondent.

PARIS, Judge:  Respondent determined deficiencies of $277,477, $10,855,409, and $763,742 for petitioner's taxable years[1] ended August 31, 2007,

---

[1]Petitioner's taxable year ran from September 1 through August 31.  Thus, the taxable years in issue range from September 1, 2006, through August 31, 2009.  For ease of discussion the Court will generally refer to the taxable years in issue as

(continued...)

2008, and 2009, respectively. In its petition petitioner challenged respondent's adjustments. Petitioner also affirmatively alleged that it had (1) erroneously included in income on its 2008 and 2009 Federal income tax returns $30,992,706.31 and $26,594,457.99, respectively, of biodiesel mixture excise tax credits refunded under section 6427(e),[2] (2) erroneously included in income on its 2008 and 2009 Federal income tax returns $175,727.99 and $374,157, respectively, of alternative fuel mixture excise tax credits refunded under section 6427(e), and (3) erroneously failed to add back certain payments into its computation of taxable income and qualified production activities income (QPAI) for purposes of determining its domestic production activities deduction (DPAD) under section 199 for 2008.

---

[1](...continued)
2007, 2008, and 2009.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court's Rules of Practice and Procedure.

After concessions,[3] the issues for consideration are whether: (1) certain payments petitioner made to its members and certain payments petitioner received from a cooperative of which it is a member constitute per-unit retain allocations paid in money (PURPIMs) within the meaning of subchapter T under chapter 1 of subtitle A of the Internal Revenue Code (sections 1381 through 1388), (2) petitioner must compute its DPAD separately for patronage and nonpatronage activities, (3) if separate computations are not required, petitioner may use its DPAD to offset any of its taxable income or must allocate its DPAD between its patronage and nonpatronage accounts, and (4) petitioner's excess DPAD (if any) may create or increase a net operating loss under section 1.199-7(c), Income Tax Regs.[4]

---

[3]On August 11, 2016, the parties filed a stipulation of settled issues. The parties agree that the biodiesel mixture excise tax credits and alternative fuel mixture excise tax credits petitioner received are not includible in petitioner's gross receipts. Additionally, the parties agree to the amounts and allocations of various values that factor into petitioner's DPAD computations for 2007, 2008, and 2009. The stipulation of settled issues is binding in the parties' Rule 155 computations.

[4]For purposes of this issue petitioner's taxable year 2006 (September 1, 2005, through August 31, 2006) is also relevant. The Court will discuss 2006 as background.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first stipulation of facts and the attached exhibits are incorporated herein by this reference.

Petitioner consists of parent company Ag Processing, Inc. a cooperative (AGP) and several subsidiaries. For Federal income tax purposes AGP is a corporation operating on a cooperative basis to which part I of subchapter T applies (subchapter T cooperative). AGP is a nonexempt subchapter T cooperative. AGP is also a specified agricultural or horticultural cooperative as defined in section 199(d)(3)(F). Petitioner's principal place of business was in Nebraska when it timely filed its petition.

I.      Petitioner's Structure

During 2006 through 2009 petitioner owned certain active and inactive corporations, limited liability companies, and foreign companies. Petitioner filed consolidated returns for 2006 through 2009. Petitioner constituted an expanded affiliated group (EAG) under section 199(d)(4) and computed its DPAD as though it were a single corporation.[5] As relevant to petitioner's DPAD computation for

_____

[5]See infra pp. 48-49 for further discussion of an EAG's DPAD computation under sec. 199(d)(4).

2006 through 2009 AGP wholly owned the following entities: (1) AGP Grain Marketing, LLC (AGP Grain Marketing), a disregarded entity for Federal income tax purposes treated as a division of AGP; (2) AGP Grain, Ltd., which engaged in marketing grain and operated on a nonpatronage basis; (3) AGP Corn Processing, Inc., which produced ethanol and operated on a nonpatronage basis; (4) Ag Environmental Products, L.L.C., which marketed the biodiesel fuel produced by AGP and operated on a nonpatronage basis; and (5) Ag Processing Incorporated, which served as a holding company for investments in two foreign companies and operated on a nonpatronage basis.

## II. Petitioner's Business

AGP is an agricultural cooperative engaged in procuring, processing, marketing, and transporting oilseeds, grains, and related products. AGP's businesses include soybean processing, vegetable oil refining, renewable fuels, grain and agricultural products, and international businesses. AGP operates soybean processing plants, soybean oil refineries, and biodiesel production facilities. AGP is member owned, and its operations benefit its members, among others.

For 2006 through 2009 AGP's members included over 170 local farmer-owned cooperatives and several regional cooperatives. AGP conducted business

with its members on a patronage basis, and members were eligible to share in patronage dividends paid by AGP. AGP conducted business with nonmembers on a nonpatronage basis, and nonmembers were not entitled to share in patronage dividends paid by AGP.[6]

AGP's principal business involved processing and marketing soybeans purchased from members and nonmembers. During 2006 through 2009 AGP acquired over 200 million bushels of soybeans per year.[7] AGP marketed soybeans from members on a patronage basis and from nonmembers on a nonpatronage basis. AGP acquired 77.78%, 76.56%, 76.63%, and 74.38% of its soybean bushels from members on a patronage basis in 2006, 2007, 2008, and 2009, respectively.

Each soybean purchase was made at a fixed price without reference to AGP's net earnings pursuant to a contract (soybean contract) between AGP and each member or nonmember. To set the price for each soybean contract, AGP started with the Chicago Board of Trade's then-current market price per bushel

---

[6]Sec. 1.1388-1(e), Income Tax Regs., provides that "patron" includes "any person with whom or for whom the cooperative association does business on a cooperative basis, whether a member or a nonmember of the cooperative association". Only petitioner's members are patrons.

[7]One bushel is approximately 60 pounds of soybeans.

and adjusted the amount to arrive at a "basis" price. The final price in each soybean contract included adjustments for locality and for factors affecting the quality of the soybeans (i.e., moisture, odors, foreign material, and protein content). Each soybean contract covered one or more soybean deliveries from the seller to AGP. AGP paid the full amount due under each soybean contract (soybean payment) in cash at the time specified in the contract, which was typically within two to three days after delivery. The soybean contracts did not specify the tax treatment of the soybean payments or otherwise characterize them. The soybean contracts did not reference the use of a per-unit retain allocation system. A soybean contract with a member and a soybean contract with a nonmember had the same terms. Upon delivery the soybeans were commingled for processing such that the soybeans from members were not distinguished or separated from the soybeans from nonmembers.

AGP made soybean payments to its members totaling $989,725,211, $1,187,491,538, $1,952,086,277, and $1,577,625,253 for 2006, 2007, 2008, and 2009, respectively. AGP also paid patronage dividends to its members totaling $31,000,000, $46,200,000, $88,214,683, and $13,500,000 for 2006, 2007, 2008, and 2009, respectively.

AGP marketed grain that it purchased from members and nonmembers through AGP Grain Marketing. AGP Grain Marketing acquired over 90 million bushels of grain per year during 2006, 2007, 2008, and 2009. AGP Grain Marketing marketed grain from members on a patronage basis and from nonmembers on a nonpatronage basis. AGP Grain Marketing acquired 42.53%, 34.43%, 30.49%, and 37.49% of its grain bushels from members on a patronage basis in 2006, 2007, 2008, and 2009, respectively. Each grain purchase was made at a fixed price without reference to AGP's or AGP Grain Marketing's net earnings pursuant to a contract (grain contract) between AGP Grain Marketing and each member or nonmember. AGP Grain Marketing paid the amount due under each grain contract (grain payments) in cash at the time specified in the contract. The grain contracts did not specify the tax treatment of the grain payments or otherwise characterize them. The grain contracts did not reference the use of a per-unit retain allocation system. A grain contract with a member and a grain contract with a nonmember had the same terms. Upon delivery the grain was commingled for processing such that the grain from members was not distinguished or separated from the grain from nonmembers.

AGP Grain Marketing made payments to members under the grain contracts totaling $131,458,557, $134,795,630, $198,179,971, and $158,166,019 in 2006,

2007, 2008, and 2009, respectively. AGP Grain Marketing also paid patronage dividends to members totaling $1,642,000, zero, $734,000, and $4,360,000 in 2006, 2007, 2008, and 2009, respectively. In 2006, 2007, 2008, and 2009 AGP Grain Marketing also sold grain on a patronage basis to another cooperative of which it was a member. AGP Marketing received payments for the grain from the cooperative of $6,547,781, $7,086,066, $3,737,092, and $1,471,180 for 2006, 2007, 2008, and 2009, respectively.

III.    Petitioner's Private Letter Ruling (PLR) 117726-09

Petitioner had reported the soybean and grain payments as purchases. Beginning in 2005 new legislation passed by Congress included section 199, which allowed a deduction for income attributable to domestic production activities and included computation rules specific to certain types of cooperatives. The new legislation prompted questions as to the correct treatment of payments made from a cooperative to patrons for products processed or marketed for them. In 2008 the Internal Revenue Service (IRS) released advice suggesting that cash payments from cooperatives to patrons for crops were PURPIMs under subchapter T and for purposes of the cooperative's DPAD calculation. See Chief Counsel Adv. (C.C.A.) 200806011 (Oct. 22, 2007). The IRS also issued several PLRs to other subchapter T cooperatives concluding that certain payments made to patrons

for products processed and/or marketed by the cooperatives were PURPIMs under subchapter T and for purposes of the cooperatives' DPAD calculations.[8] Petitioner believed the payments addressed in CCA 200806011 and the PLRs were similar to its soybean payments.

Petitioner submitted to the IRS a PLR request dated March 27, 2009, asking for a ruling that (1) the soybean payments petitioner made to its members constitute PURPIMs for purposes of section 1382(b)(3); and (2) in computing petitioner's DPAD, petitioner's QPAI and taxable income should, pursuant to section 199(d)(3)(C), be computed without regard to any deduction for the soybean payments. In describing its business operations petitioner specified that its members deliver soybeans to petitioner under the terms outlined in "purchase contracts". Petitioner submitted with its PLR request a copy of its bylaws, which did not reference the use of a per-unit retention system. Petitioner specified that it and the member negotiate a price per bushel of soybeans in advance of delivery and make adjustments for various factors, resulting in a final price (referred to in the PLR request as "bean settlements" and in the PLR as "b settlements").

---

[8]Priv. Ltr. Ruls. 200838011 (June 18, 2008), 200843015 (July 21, 2008), 200843016 (July 21, 2008), 200843023 (July 24, 2008), 200852022 (Sept. 17, 2008), 200909016 (Nov. 24, 2008), 200909020 (Nov. 26, 2008), and 201219001 (Feb. 3, 2012).

On August 12, 2009, respondent issued to petitioner Priv. Ltr. Rul. 117726-09, which stated in relevant part:

> Taxpayer's b settlements qualify as per-unit retain allocations within the meaning of section 1388(f) of the Code because they are (1) distributed with respect to b that Taxpayer markets for its patrons; (2) the patrons receive the payments based on the quantity of b delivered; (3) the b settlements are determined without reference to Taxpayer's net earnings; (4) the b settlements are paid pursuant to a contract with the patrons establishing the necessary pre-existing agreement and obligation; and (5) the b settlements are paid within the payment period of section 1382(d). * * *

Respondent ruled that: (1) the soybean payments petitioner made to its members for beans delivered to petitioner constitute PURPIMs for purposes of section 1382(b)(3); and (2) in computing its DPAD, petitioner's QPAI and taxable income should, pursuant to section 199(d)(3)(C), be computed without regard to any deduction for the soybean payments. The PLR also stated: "Such per-unit retains are to be reported in box 3 of Form 1099-PATR, 'Taxable Distributions Received From Cooperatives.'" The PLR did not condition its conclusion on petitioner's making any modifications to its soybean contracts or to its bylaws.

IV. Tax Returns

A. 2006 Return

On September 10, 2007, petitioner timely filed (with an extension) Form 990-C, Farmers' Cooperative Association Income Tax Return, for its taxable year

ended August 31, 2006. Petitioner reported its soybean and grain payments to members as purchases instead of PURPIMs on its Form 990-C Schedule A, Cost of Goods Sold, and did not add back any PURPIMs to its QPAI or taxable income in determining its DPAD.[9] Petitioner computed its taxable income for purposes of determining its DPAD by disregarding the deduction for patronage dividends. On February 2, 2010, after receiving its PLR, petitioner filed a second amended Form 990-C for 2006[10] claiming a refund on the basis of its position that it was entitled to an increased DPAD. Petitioner's position was based on a recomputation of its DPAD that treated the soybean and grain payments as PURPIMs and added back those amounts in computing QPAI and taxable income. On July 14, 2014, respondent issued petitioner a notice of disallowance of claim for refund with respect to petitioner's February 2, 2010, second amended Form 990-C for 2006.

B.    2007 Return

On October 8, 2008, petitioner timely filed (with an extension) Form 990-C for its taxable year ended August 31, 2007. Petitioner reported its soybean and

---

[9]See infra pp. 38-39 for a discussion of the mechanics of the DPAD computation for a specified agricultural or horticultural cooperative.

[10]On January 21, 2009, petitioner filed an amended Form 990-C for 2006 claiming a $497,600 refund resulting from an increase in general business credits. Respondent processed the amended return and issued a refund to petitioner.

grain payments to members as purchases instead of PURPIMs on its Schedule A and did not add back any PURPIMs to its QPAI or taxable income in determining its DPAD. On February 2, 2010, after receiving its PLR, petitioner filed an amended Form 990-C for 2007 claiming a refund on the basis of its position that it was entitled to an increased DPAD. Petitioner's position was based on a recomputation of its DPAD that treated the soybean and grain payments as PURPIMs and added back those amounts in computing its QPAI and taxable income.

C.    2008 Return

On September 15, 2009, after receiving its PLR, petitioner timely filed (with an extension) Form 1120-C, U.S. Income Tax Return for Cooperative Associations, for its taxable year ended August 31, 2008. Petitioner reported the soybean payments (but not the grain payments)[11] it made to members as PURPIMs on its Schedule A and added back those amounts in computing its QPAI and taxable income in determining its DPAD. Petitioner computed its taxable income for purposes of determining its DPAD by disregarding the deduction for patronage dividends.

---

[11]In its petition, petitioner alleged that it had erroneously failed to treat the grain payments it made to members in 2008 as PURPIMs for purposes of its DPAD computation.

D.     2009 Return

On September 24, 2010, petitioner timely filed (with an extension) Form 1120-C for its taxable year ended August 31, 2009.  Petitioner reported the soybean and grain payments as PURPIMs on its Schedule A and added back those amounts in computing its QPAI and taxable income in determining its DPAD. Petitioner computed its taxable income for purposes of determining its DPAD by disregarding the deduction for patronage dividends.

Petitioner revised its DPAD computations to reflect the positions it now takes.  Petitioner's revised computations treat the soybean and grain payments it made and the payments it received from another cooperative as PURPIMs.  For 2006 and 2007 petitioner prepared Form 8817, Allocation of Patronage and Nonpatronage Income and Deductions, to attach to its Form 990-C.  For 2008 and 2009 petitioner prepared Schedule G, Allocation of Patronage and Nonpatronage Income and Deductions, to attach to its Form 1120-C.[12]  In general petitioner used the percentages of bushels purchased from members and nonmembers to allocate values between patronage and nonpatronage income and deductions (i.e., gross

_____

[12]Versions of the forms in the record show values for each entity that was part of petitioner's EAG for purposes of its DPAD computation.  The forms reflect the positions petitioner now takes with respect to its second amended return for 2006, its amended return for 2007, its original return for 2008, and its original return for 2009.

receipts, cost of goods sold, etc.).  For each taxable year petitioner allocated the entire DPAD amount to the nonpatronage column on Form 8817 or Schedule G.

E.    Forms 1099-PATR

Each calendar year petitioner issued to its members Forms 1099-PATR, Taxable Distributions Received From Cooperatives.  AGP issued patronage statements to its members detailing the amount of each member's patronage refund as well as the amount of the DPAD (if any) passed through to the member.  The patronage statements were created on the basis of AGP's fiscal year and reflected business conducted through AGP Grain Marketing as well.  After receiving its PLR petitioner issued revised Forms 1099-PATR to its members for 2005 through 2008[13] reporting the soybean and grain payments in box 3 as per-unit retain allocations (PURAs).  Originally, petitioner had left box 3 blank on the Forms 1099-PATR issued to its members.[14]  Per the statement in its PLR, on the original

_____

[13]The Forms 1099-PATR were issued with respect to each calendar year, not with respect to petitioner's taxable year or necessarily with respect to the taxable years of the members.

[14]Petitioner believed it had to report only the patronage dividends, see sec. 6044(b), and passed-through DPAD amounts, see sec. 1.199-6(g), Income Tax Regs., it issued to patrons.  Petitioner believed that it had to report per-unit retain allocations paid in certificates (PURPICs) but not PURPIMs.  See sec. 6044(b)(1)(D).  Petitioner chose to issue revised Forms 1099-PATR for calendar years 2005 through 2008 because of the statement in its PLR that per-unit retains

(continued...)

Forms 1099-PATR for 2009, petitioner reported the soybean and grain payments in box 3 as PURAs.

OPINION

In general, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

I. Background Law

A. Subchapter T

Subchapter T was enacted as part of the Revenue Act of 1962, Pub. L. No. 87-834, sec. 17, 76 Stat. at 1045. As enacted, subchapter T required a cooperative to determine its taxable income without regard to amounts paid to patrons as patronage dividends. Id. Section 1388(a) defines a patronage dividend as an obligatory amount paid to a patron "on the basis of quantity or value of business done with or for such patron" that is "determined by reference to the net earnings of the organization from business done with or for its patrons."

Subchapter T was amended in 1966 to include a deduction for PURPICs. Act of Nov. 13, 1966, Pub. L. No. 89-809, sec. 211, 80 Stat. at 1580. The

_____

[14](...continued)
were to be reported on Form 1099-PATR.

amendment reflected a general practice by cooperatives of retaining a portion of the proceeds from products the cooperatives marketed for patrons. S. Rept. No. 89-1707, at 69 (1966), 1966-2 C.B. 1059, 1107-1108. Because the amounts retained (and reflected in the certificates) were computed on the basis of units of the products marketed and not with reference to the cooperative's net earnings, they were not written notices of allocation. See Farm Serv. Coop. v. Commissioner (Farm Service), 619 F.2d 718, 725 (8th Cir. 1980), rev'g 70 T.C. 145 (1978); S. Rept. No. 89-1707, supra at 69, 1966-2 C.B. at 1108. At the time there was no deduction for payments to patrons made in money or other property but that did not qualify as patronage dividends.

Subchapter T was further amended in 1969 to include a deduction for PURPIMs. Tax Reform Act of 1969, Pub. L. No. 91-172, sec. 911, 83 Stat. at 722. The amendment sought to address the situation in which a cooperative wished to make cash payments to patrons at some point before the time the cooperative was able to determine its net earnings. S. Rept. No. 91-552, at 293 (1969), 1969-3 C.B. 423, 609. Such payments would generally not qualify as patronage dividends because they were not made with reference to the cooperative's net earnings. See id. They also did not qualify as PURAs under the then-existing definition because

they were made in cash and not in qualified certificates.[15]  See id.  Seeing "no reason why a cooperative should be able to deduct per unit retain allocations paid as qualified certificates during the 8½ month period following the close of the taxable year, but not per unit retain allocations paid in money during the same period", Congress modified the definition of PURAs and included a deduction to the cooperative for PURPIMs.  Id.

As amended, section 1382(b) provides as follows:

SEC. 1382(b).  Patronage Dividends and Per-Unit Retain Allocations.--In determining the taxable income of an organization to which this part applies, there shall not be taken into account amounts paid during the payment period for the taxable year--

(1) as patronage dividends (as defined in section 1388(a)), to the extent paid in money, qualified written notices of allocation (as defined in section 1388(c)), or other property (except nonqualified written notices of allocation (as defined in section 1388(d))) with respect to patronage occurring during such taxable year;

(2) in money or other property (except written notices of allocation) in redemption of a nonqualified written notice of allocation which was paid as a patronage dividend during the payment period for the taxable year during which the patronage occurred;

(3) as per-unit retain allocations (as defined in section 1388(f)), to the extent paid in money, qualified per-unit retain

_____

[15]The payments were still called "per-unit retain allocations" even though the cooperative did not "retain" anything.

certificates (as defined in section 1388(h)), or other property (except nonqualified per-unit retain certificates, as defined in section 1388(i)) with respect to marketing occurring during such taxable year; or

(4) in money or other property (except per-unit retain certificates) in redemption of a nonqualified per-unit retain certificate which was paid as a per-unit retain allocation during the payment period for the taxable year during which the marketing occurred.

For purposes of this title, any amount not taken into account under the preceding sentence shall, in the case of an amount described in paragraph (1) or (2), be treated in the same manner as an item of gross income and as a deduction therefrom, and in the case of an amount described in paragraph (3) or (4), be treated as a deduction in arriving at gross income.

The patron's gross income includes patronage dividends, PURPIMs, qualified PURPICs, and qualified written notices of allocation. Sec. 1385(a); sec. 1.61-5, Income Tax Regs. In order for a PURPIC or a written notice of allocation to be "qualified", the patron must consent to include the stated dollar amount in gross income. Sec. 1388(c), (h). Qualified PURPICs and qualified written notices of allocation in effect "represent amounts distributed to patrons and reinvested in the cooperative as capital." Farm Service, 619 F.2d at 725. The effect of all of these provisions is that income attributable to business done with or for patrons is

generally taxed at the patron level and subject to a single level of taxation.[16]  In

contrast, income not attributable to business done with or for patrons[17] is taxed

like any other corporation's income.  Id. at 723.  Exempt cooperatives also deduct

distributions paid out of nonpatronage earnings, but cooperatives must meet

certain criteria in order to have exempt status.  Sec. 1382(c).  Petitioner is a

nonexempt cooperative.

B.     Domestic Production Activities Deduction

Section 199 was added to the Internal Revenue Code by the American Jobs

Creation Act of 2004, Pub. L. No. 108-357, sec. 102(a), 118 Stat. at 1424, to

provide a tax deduction for certain domestic production activities.[18]  The

---

[16]The theory behind this single level of taxation has been stated in different ways:  "[T]he cooperative is merely an agent for the patron; a patronage dividend constitutes a rebate or price adjustment for the patron; or the money returned in fact always belonged to the patron."  Farm Serv. Coop. v. Commissioner, 619 F.2d 718, 722 (8th Cir. 1980) (citing Des Moines Cty. Farm Serv. Co. v. United States, 324 F. Supp. 1216, 1219 (S.D. Iowa 1971)), aff'd, 448 F.2d 776 (8th Cir. 1971), rev'g 70 T.C. 145 (1978); see also S. Rept. No. 87-1881, at 116 (1962), 1962-3 C.B. 707, 822.

[17]See infra pp. 40-41 for further discussion regarding the distinction between patronage and nonpatronage income.

[18]The Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, sec. 13305(a) and (c), 131 Stat. at 2126, eliminated sec. 199 for taxable years beginning after December 31, 2017.

deduction is for an amount equal to a percentage[19] of the lesser of the taxpayer's

QPAI or taxable income. Sec. 199(a). The taxpayer's DPAD cannot exceed 50%

of the wages reported on Form W-2, Wage and Tax Statement, of the taxpayer for

the taxable year. Sec. 199(b)(1). Section 199(c) defines QPAI as follows:

> SEC. 199(c). Qualified Production Activities Income.--For purposes of this section--
>
> (1) In general. The term "qualified production activities income" for any taxable year means an amount equal to the excess (if any) of--
>
> (A) the taxpayer's domestic production gross receipts for such taxable year, over
>
> (B) the sum of--
>
> (i) the cost of goods sold that are allocable to such receipts, and
>
> (ii) other expenses, losses, or deductions (other than the deduction allowed under this section), which are properly allocable to such receipts.

Section 199(d)(3) includes rules applicable to specified agricultural and

horticultural cooperatives. Such cooperatives determine taxable income without

---

[19]The DPAD was "phased in" beginning in 2005. For taxable years beginning in 2005 or 2006 the allowable deduction was for an amount equal to 3%. For taxable years beginning in 2007, 2008, or 2009 the allowable deduction was for an amount equal to 6%. For taxable years beginning in 2010 and after, the allowable deduction was increased to 9%.

regard to any deduction allowable under section 1382(b) (relating to patronage dividends and PURAs) or section 1382(c) (relating to nonpatronage distributions). Sec. 199(d)(3)(C).

## II.    Soybean and Grain Payments

Section 1382(b)(3) permits a deduction for PURPIMs paid by a cooperative during the "payment period" for the taxable year, which section 1382(d) defines as "the period beginning with the first day of such taxable year and ending with the fifteenth day of the ninth month following the close of such year."[20]  Section 1388(f) defines "per-unit retain allocation" as follows:

> SEC. 1388(f).  Per-Unit Retain Allocation.--For purposes of this subchapter, the term "per-unit retain allocation" means any allocation, by an organization to which part I of this subchapter applies, to a patron with respect to products marketed for him, the amount of which is fixed without reference to the net earnings of the organization pursuant to an agreement between the organization and the patron.

---

[20]This translates to an 8-1/2-month period.  Petitioner's taxable year began September 1 and ended August 31.  Therefore, under sec. 1382(d) its payment period for any given taxable year ended on May 15 of the calendar year following the end of the taxable year.  For example, petitioner's 2007 taxable year was from September 1, 2006, to August 31, 2007, and its payment period was from September 1, 2006, to May 15, 2008.  Petitioner issued Forms 1099-PATR on the basis of the calendar year.  Therefore, soybean and grain payments made during the payment period for a given taxable year could be reported to patrons in three separate calendar years.

A.    Requirements Under Subchapter T With Respect to PURPIMs

Respondent argues that the "agreement" in section 1388(f) is an agreement between the cooperative and the patron allowing the cooperative to use a per-unit retain allocation system and that the parties must agree to treat payments as PURPIMs.[21]  Therefore, respondent maintains that the soybean and grain payments in 2006, 2007, and 2008 did not constitute PURPIMs.  Additionally, respondent argues that the soybean and grain payments were not PURPIMs because they were not designated as such on petitioner's Forms 1099-PATR within the 8-1/2-month payment period described in section 1382(d).  With respect to 2009 respondent contends that the soybean and grain contracts, coupled with petitioner's reporting on the Forms 1099-PATR it issued to patrons, satisfied the agreement requirement.  Petitioner argues that the "agreement" requirement in section 1388(f) serves merely to distinguish obligatory payments from the cooperative to the patron from voluntary ones.  Petitioner states, therefore, that the soybean and grain contracts themselves, which establish an obligatory payment, constitute the "agreement" under section 1388(f).  Petitioner further argues that the 8-1/2-month payment

_____

[21]Respondent essentially argues that the cooperative and patron must agree as to the tax treatment of the payments.

period specifies the time within which the cooperative must make the payment; it does not require the designation of the payment as a PURPIM.

  1.  The "Agreement" Between the Cooperative and the Patron

  In construing a statute, the Court generally gives effect to the plain and ordinary meaning of its terms. United States v. Locke, 471 U.S. 84, 93 (1985). Here the parties' dispute hinges on the scope of the word "agreement" as used in section 1388(f). Neither section 1388(f) nor its supporting regulations prescribe any particular form that the agreement must take or specific terms or wording that the agreement must incorporate. To determine the meaning of the word "agreement" it is necessary to consider "the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997). When placed in context the word "agreement" in section 1388(f) is part of the larger phrase "the amount of which is fixed without reference to the net earnings of the organization pursuant to an agreement between the organization and the patron." The word "agreement" refers to the fixed amount of the allocation, not to its characterization for tax purposes. The allocation may be paid in a certificate and/or in money or other property. See sec. 1382(b)(3).

Comparatively, subchapter T uses the word "agreement" in two places other than in section 1388(f). Section 1382(g) provides circumstances under which a cooperative is permitted to compute its taxable income with respect to a pool opened before March 1, 1978, under the completed crop pool method of accounting. As pertinent here, section 1382(g)(1)(B) provides:

> (B) with respect to the pool, the organization has entered into an <u>agreement</u> with the United States or any of its agencies which includes provisions to the effect that--

> \* \* \* \* \* \* \*

> (iii) an amount equal to the net proceeds (as determined under such <u>agreement</u>) from the sale or exchange of the products in the pool shall be used to repay such loan until such loan is repaid in full (or all the products in the pool are disposed of), and

> (iv) the net gains (as determined under such <u>agreement</u>) from the sale or exchange of such products shall be distributed to eligible producers, except to the extent that the United States or such agency permits otherwise.
> [Emphasis added.]

Thus, to compute its taxable income using the completed crop pool method of accounting, a cooperative must enter into an agreement, and that agreement must include specific provisions.

Similarly, section 1388(h) imposes additional criteria that must be met in order for a cooperative to deduct PURAs paid in the form of PURPICs. In order

for a cooperative to deduct a PURPIC, it must be a "qualified" PURPIC, which is

defined as follows:

SEC. 1388(h).  Qualified Per-Unit Retain Certificate.--

(1) Defined.--For purposes of this subchapter, the term "qualified per-unit retain certificate" means any per-unit retain certificate which the distributee has <u>agreed</u>, in the manner provided in paragraph (2), to take into account at its stated dollar amount as provided in section 1385(a).

(2) Manner of obtaining <u>agreement</u>.--A distributee shall <u>agree</u> to take a per-unit retain certificate into account as provided in paragraph (1) only by--

(A) making such <u>agreement</u> in writing, or

(B) obtaining or retaining membership in the organization after--

(i) such organization has adopted (after November 13, 1966) a bylaw providing that membership in the organization constitutes such <u>agreement</u>, and

(ii) he has received a written notification and copy of such bylaw.
[Emphasis added.]

Thus, for the cooperative to deduct a PURPIC, the cooperative and the

patron must agree to treat the PURPIC as income to the patron for tax purposes.

No comparable requirement exists with respect to PURPIMs, which typically are cash payments.[22]

When construing a statute, the Court must interpret it so as to "avoid rendering any part of the statute meaningless surplusage." 15 W. 17th St. LLC v. Commissioner, 147 T.C. 557, 586 (2016). If the Court were to interpret the word "agreement" in section 1388(f) as implying an agreement as to the payment's tax treatment, it would render at least part of section 1388(h) superfluous. In sections 1382(g) and 1388(h) Congress specified the manner and/or form an agreement must take. Had Congress wanted to specify the form of the agreement or additional criteria for the exclusion of PURPIMs from a cooperative's gross income, it could have done so.

Respondent's argument rests primarily on the risk that the failure to agree will lead to a lack of parity in how such payments are reported, particularly with respect to the DPAD; a cooperative might treat a payment made to a patron as a PURPIM and disregard it for purposes of its DPAD computation, while a patron

---

[22]The distinction makes sense from a practical perspective. A PURPIC is treated as a distribution to the patron and a contribution to capital. See supra p. 20. The agreement between the cooperative and the patron as to its tax treatment ensures that the patron agrees to include in gross income an amount that it receives only constructively. A PURPIM, in contrast, is generally a cash payment that the patron actually receives.

might treat a payment as a purchase and include it in its QPAI and taxable income in its DPAD computation as well.  This disparity in treatment would result in both the cooperative and the patron potentially having the benefit of a larger DPAD.[23]

Respondent's argument is misplaced.[24]  This Court has previously applied a strict construction of subchapter T's provisions, noting particularly the specificity with which it was drafted.  See Seiners Ass'n v. Commissioner, 58 T.C. 949, 955-956 & n.5 (1972) ("[I]t is imperative that we strictly construe the provisions of that subchapter, for it is clear from the legislative history and the state of events in existence prior to the enactment of subch. T that Congress intended the statute be

---

[23]For purposes of its computation of taxable income under subch. T, there is little difference from the cooperative's perspective.  Under sec. 1382(b) a PURPIM is treated as a "deduction in arriving in gross income."  It is reported on Schedule A, just as a payment for goods that are later sold is taken into account as a cost of goods sold and reported on Schedule A.  Likewise, the patron's gross income would include the payment whether designated a payment for goods or a PURPIM.  The distinction matters in the cooperative's DPAD computation, however, because the cooperative disregards the deduction for PURPIMs, sec. 199(d)(3)(C), and the patron does not take a PURPIM into account in its own DPAD computation, sec. 1.199-6(l), Income Tax Regs.

[24]The Court is not persuaded that Forms 1099-PATR based on the calendar year, as petitioner's were, would solve the potential disparate treatment problem that concerns respondent.  Not all of petitioner's members operated on a calendar year.  Therefore, the Forms 1099-PATR would not necessarily reflect all PURPIMs made to a member during the member's taxable year.  Instead, in computing its own DPAD a member would need to review its own books to determine the amount of PURPIMs it received from petitioner.

exacting and specific so that cooperatives and their patrons might not be forced back into that unsure state which existed prior to 1962.").  All payments that meet the definition of PURPIMs are PURPIMs under subchapter T.

The statute does not support respondent's argument that the cooperative and the patron must agree upon the use of a per-unit retain allocation system.[25]  The Court declines to read into the statute respondent's additional wording requiring the organization and the patron to agree on the tax treatment of cash payments before they are treated as PURAs.

### 2.    The "Payment Period" Under Section 1382(d)

Similarly, the 8-1/2-month period in section 1382(d) describes the time within which the PURPIM must be <u>made</u> following the close of the taxable year in order for the cooperative to deduct it from taxable income.  It does not require the

---

[25]Moreover, respondent's argument does not appear consistent with his position that the 2009 soybean and grain payments were PURPIMs.  The soybean and grain contracts for 2009 were not materially different from those for 2006, 2007, and 2008.  None of the contracts referenced a "per-unit retain allocation system".  Similarly, the PLR makes no reference to a per-unit retain allocation system or to an agreement to use one.  Instead, it states that "the b settlements are paid pursuant to a contract with the patrons establishing the necessary pre-existing agreement and obligation".  Petitioner described the agreement in its PLR request and submitted a copy of its bylaws.  The PLR does not condition its determination on any modification to either.  To the extent respondent relies on the historical practice by cooperatives to retain a portion of the proceeds owed to patrons and issue certificates to the patrons reflecting the amounts due, there is no such retention of proceeds when a payment is made in money or other property.

cooperative to designate a payment as a PURPIM during that time. Again, the Court declines to read additional wording into the statute.

Petitioner has established that the soybean and grain payments were made to patrons with respect to products petitioner marketed for them. The amounts were not determined with reference to petitioner's net earnings but were instead fixed amounts based on the Chicago Board of Trade's prices and adjustments for locality and quality-related factors. The terms were memorialized in the soybean and grain contracts. The Court concludes that the payments constitute PURPIMs. Petitioner has also established that the payments were made within the 8-1/2-month payment period as defined under section 1382(d). Therefore, the payments are properly deductible from petitioner's computation of its taxable income, and those deductions in turn are properly disregarded in petitioner's computation of its taxable income and QPAI for purposes of computing its DPAD. Similarly, petitioner must treat the payments it received from the other cooperative as PURPIMs for purposes of its DPAD computation.

B.    Disavowing Form

Respondent further argues that petitioner is precluded from "disavowing its form" by changing its treatment of the soybean and grain payments from

purchases to PURPIMs. Respondent first made this argument in his first amendment to answer.

While the Commissioner may look past the form of a transaction to its substance, taxpayers are generally bound by their chosen form of transaction. Estate of Durkin v. Commissioner, 99 T.C. 561, 571 (1992). In general taxpayers may not "disavow" that form to avail themselves later of a more favorable tax consequence. However, under certain circumstances, a taxpayer may be permitted to disavow the form adopted for a transaction. In determining whether a taxpayer may attempt to argue that the substance, rather than the form, of its transaction should control for tax purposes, this Court has considered at least four factors: (1) whether the taxpayer seeks to disavow its own tax return treatment for the transaction, (2) whether the taxpayer's tax reporting and other actions show an honest and consistent respect for the alleged substance of the transaction, (3) whether the taxpayer is unilaterally attempting to have the transaction treated differently after it has been challenged, and (4) whether the taxpayer will be unjustly enriched if permitted to alter the transactional form. See, e.g., Pinson v. Commissioner, T.C. Memo. 2000-208, 2000 Tax Ct. Memo LEXIS 247, at *33-*34.

As an initial matter, the Court must decide whether petitioner's position that the soybean and grain payments constitute PURPIMs is an attempt to disavow the form of its transaction.

The soybean and grain contracts were silent as to the appropriate tax treatment of the soybean and grain payments. Petitioner initially treated the soybean and grain payments as purchases for 2006 and 2007. It reported the payments as costs of goods sold and did not add them back in computing its DPAD. The PLR stated that the soybean payments in 2009 were PURPIMs for purposes of computing the DPAD under section 199. After receiving the PLR petitioner relied on its rationale and amended its Forms 990-C for 2006 and 2007 by treating the soybean and grain payments made with respect to those years as PURPIMs in computing its DPAD, resulting in a larger DPAD. For 2006 and 2007 petitioner did not report any PURPIMs on the Forms 1099-PATR it issued to its patrons. After receiving the PLR petitioner issued revised Forms 1099-PATR to its patrons. For 2008 petitioner treated the soybean payments as PURPIMs in its DPAD computation. It did not initially report any PURPIMs on the Forms 1099-PATR it issued to its patrons, but it did issue revised Forms 1099-PATR to its patrons after receiving the PLR.

Section 1382(b) provides as follows:

> SEC. 1382(b). Patronage Dividends and Per-Unit Retain Allocations.--In determining the taxable income of an organization to which this part applies, there <u>shall not</u> be taken into account amounts paid during the payment period for the taxable year--
>
> \*     \*     \*     \*     \*     \*     \*
>
> > (3) as per-unit retain allocations (as defined in section 1388(f)), to the extent paid in money, qualified per-unit retain certificates (as defined in section 1388(h)), or other property (except nonqualified per-unit retain certificates, as defined in section 1388(i)) with respect to marketing occurring during such taxable year * * *
> > [Emphasis added.]

The Court looks to the plain and ordinary meaning of the terms used in a statute to interpret its meaning. The use of the mandate "shall not" means that the provision is not elective. Therefore, to the extent the soybean and grain payments were PURPIMs, petitioner was directed by section 1382(b) not to take them into account in determining its taxable income. Accordingly, the Court concludes that petitioner did not disavow the form of its transaction. Instead, it relied on the definition of PURAs in the Internal Revenue Code and the rationale in the PLR to apply the correct tax treatment to the soybean and grain payments.

C.    Equitable Principles

Respondent also argues that under the equitable principles of the doctrine of election and the duty of consistency, petitioner's cash payments should not be treated as PURPIMs.  This Court may apply general equitable principles in deciding matters over which it otherwise has jurisdiction.  See Woods v. Commissioner, 92 T.C. 776, 784-785 (1989).

1.    Doctrine of Election

The doctrine of election is an equitable principle that generally precludes a taxpayer who makes a conscious election from revoking or amending that election without the consent of the Commissioner.  See, e.g., Pac. Nat'l Co. v. Welch, 304 U.S. 191 (1938).  The Court has applied the doctrine where (1) there is a free choice between two or more alternatives and (2) there is an overt act by the taxpayer communicating the choice to the Commissioner.  See Grynberg v. Commissioner, 83 T.C. 255, 261 (1984).  Respondent argues that petitioner initially elected to treat the soybean and grain payments as purchases and is therefore barred from later electing to treat them as PURAs.  As discussed supra pp. 23, 34, section 1388(f) defines PURAs and section 1382(b) mandates their exclusion from gross income when paid in money.  Petitioner did not have a free choice between two or more alternatives.  To hold otherwise would risk subjecting

a cooperative's patronage earnings to double taxation, a result that would not comport with the structure of subchapter T. See supra pp. 20-21. Accordingly, the doctrine of election is inapplicable.

## 2. Duty of Consistency

The duty of consistency is an equitable doctrine that precludes a taxpayer from benefiting in a later year from an error or omission in an earlier year that cannot be corrected because the period of limitations on assessment for the earlier year return has closed. See Estate of Letts v. Commissioner, 109 T.C. 290, 296 (2004); see also S. Pac. Transp. Co. v. Commissioner, 75 T.C. 497, 838-839 (1980). Respondent argues that the duty of consistency should apply here to estop petitioner from changing its Forms 1099-PATR to report the soybean and grain payments as PURPIMs after the expiration of the payment period as defined by section 1382(d). Respondent does not argue that petitioner's amended position affects petitioner's prior return or petitioner's returns with respect to which the period of limitations has expired. Instead, respondent contends that the period of limitations on assessment had expired with respect to some of petitioner's members by the time the members received the revised Forms 1099-PATR. Respondent has not identified any basis on which this Court may apply the duty of

consistency to one taxpayer where the period of limitations has expired with respect to a different taxpayer.[26]

Even if the duty of consistency were to apply, as discussed above, petitioner's change in its position corrected an error of law in its prior tax treatment of the soybean and grain payments. The payments fit the statutory definition of PURAs, and petitioner was therefore required to treat them as such.

The Court finds that the soybean and grain payments petitioner made to its patrons were PURPIMs. Therefore, they must be deducted in arriving at petitioner's taxable income, and those deductions must be disregarded for purposes of petitioner's DPAD computation. Similarly, the payments petitioner received from the other cooperative must be treated as PURPIMs in petitioner's DPAD computation.

---

[26]This Court has previously recognized that under the duty of consistency a representation by one party may bind another party where the two are deemed to be in privity. See, e.g., Estate of Letts v. Commissioner, 109 T.C. 290, 298 (2004). However, respondent does not argue, and the Court does not address, whether a similar concept should apply with respect to a cooperative and its patrons.

III.   Petitioner's DPAD

A.   Computation

Section 199 and the regulations thereunder provide rules applicable to specified agricultural or horticultural cooperatives, which are exempt and nonexempt subchapter T cooperatives engaged in the manufacturing, production, growth, or extraction of any agricultural or horticultural product or in the marketing of agricultural or horticultural products.  Section 199(d)(3)(D) attributes to a marketing cooperative the manufacturing, production, growth, or extraction activities conducted by its patrons.  Section 199(d)(3)(A) provides that a cooperative may pass through some or all of its DPAD to its patrons.  If a cooperative passes through any of its DPAD, it must reduce its deduction under section 1382(b) for PURAs and patronage dividends by an amount equal to the DPAD passed through.  Sec. 199(d)(3)(B).  Under section 199(d)(3)(C) a nonexempt specified agricultural or horticultural cooperative must compute its taxable income for purposes of its DPAD computation without regard to the deductions under section 1382(b) for patronage distributions and PURAs.[27]  The

[27]This is commonly known as "adding back" patronage dividends and PURAs.  Exempt subch. T cooperatives must also compute taxable income without regard to the deductions allowable under sec. 1382(c) relating to nonpatronage distributions.

patron, then, must disregard in its computation of taxable income for purposes of its own DPAD computation, patronage distributions and PURAs it received from a cooperative. Sec. 1.199-6, Income Tax Regs.[28]

The parties disagree about the proper method for computing petitioner's DPAD in light of petitioner's status as a nonexempt subchapter T cooperative. Petitioner argues that it should compute its DPAD in the aggregate without separating patronage from nonpatronage activities.[29] Respondent argues that petitioner must compute two separate DPADs--one for its patronage activities and one for its nonpatronage activities.

As an initial matter the Court looks to the text of section 199. This Court will look beyond the plain meaning of a statute only where the text is ambiguous, applying the plain meaning would lead to an absurd result, or possibly where there is clear evidence of contrary legislative intent. See Pollock v. Commissioner, 132 T.C. 21, 30 (2009). Section 199 provides the rules that a taxpayer must apply in computing its DPAD. Section 199(a)(1) provides that "[t]here shall be allowed as

---

[28]This is known as the "no double counting rule" and serves to ensure that patronage dividends and PURAs are not counted twice--once in the cooperative's DPAD and once in the patron's DPAD.

[29]Sec. 199(d)(4) provides that an EAG is treated as a single corporation for purposes of computing its DPAD. As relevant here petitioner's EAG included corporations that conducted business solely on nonpatronage bases.

a deduction". (Emphasis added.) Section 199(d)(3)(A) provides special rules applicable only to a specified agricultural and horticultural cooperative and references "the deduction allowed under subsection (a) to such cooperative." (Emphasis added.) The use of the singular "deduction" implies a single computation even at the cooperative level. Section 199(d)(3) does not use the term "patronage" or "nonpatronage". It makes no reference to multiple or separate computations.

Section 199(d)(3)(C) does provide, however, that "[f]or purposes of this section, the taxable income of a specified agricultural or horticultural cooperative shall be computed without regard to any deduction allowable under subsection (b) or (c) or section 1382". Because section 199(d)(3)(C) references the cooperative's computation of taxable income, the Court must address whether the general principles of subchapter T require separate computations of a patronage DPAD and a nonpatronage DPAD.

Subchapter T makes no explicit reference to separate computations of taxable income. Subchapter T requires a nonexempt cooperative to deduct patronage dividends, sec. 1382(b), which are determined "by reference to the net earnings of the organization from business done with or for its patrons", sec. 1388(a)(3). This Court has found that income is "patronage-sourced" if it is "so

closely intertwined and inseparable from the main cooperative effort that it may be properly characterized as directly related to, and inseparable from, the cooperative's principal business activity, and thus can be found to 'actually facilitate' the accomplishment of the cooperative's business purpose". Certified Grocers of Cal., Ltd. v. Commissioner (Certified Grocers), 88 T.C. 238, 243 (1987) (quoting Ill. Grain Corp. v. Commissioner, 87 T.C. 435, 459 (1986)).

Respondent argues that there is a fundamental principle inherent in subchapter T that requires separate computations.[30] Respondent's position primarily concerns the holding and reasoning in Farm Service. An analysis of Farm Service is appropriate because the Court's decision in this matter is appealable to the U.S. Court of Appeals for the Eighth Circuit, and the Court will follow that opinion as a matter of "better judicial administration" if it is "squarely in point". See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

In Farm Service, 619 F.2d at 720-721, the cooperative taxpayer issued PURPIMs to its members with respect to activities conducted as part of its broiler

---

[30]This Court has previously referenced this "fundamental principle". See Buckeye Countrymark, Inc. v. Commissioner, 103 T.C. 547, 559 (1994). However, the statement was not the holding of the case, which was narrower in scope. See infra pp. 43-44 for further discussion.

pool and deducted the PURPIMs in arriving at gross income, resulting in a broiler pool deficit. The taxpayer realized income in other divisions of its business and reduced its taxable income by offsetting that income against its broiler pool deficit. Id. at 721. The Commissioner determined that losses generated by the taxpayer's business with patrons could not be used to offset taxable income. Id. The cooperative taxpayer argued that subchapter T's silence with respect to net operating losses meant that the typical corporate rules for net operating losses applied. Id. at 723. Because corporations generally are permitted to offset losses from one business division against income from another business division, the taxpayer argued its computation was proper. Id.

The Court of Appeals held that subchapter T requires a nonexempt cooperative to segregate its patronage and nonpatronage accounts in calculating gross income--at least where PURAs contribute to net operating losses in patronage activities. Id. at 726-727. The Court of Appeals noted that subchapter T forbids a nonexempt cooperative from using its patronage losses to reduce its tax liability on non-patronage-sourced income. Id. at 727. To allow otherwise would render meaningless the distinction between exempt and nonexempt cooperatives by allowing nonexempt cooperatives to realize the benefits of exempt cooperatives without meeting the criteria set forth in section 521(b). Id.

This Court has applied the reasoning in Farm Service to state that a cooperative must separate its patronage income and expenses from its nonpatronage income and expenses in the computation of its own taxable income, and if the patronage result is a loss, the loss may not be offset against nonpatronage income. See Certified Grocers, 88 T.C. at 246, 250-251. The distinction is necessary for the cooperative to determine the amount of patronage earnings available for the issuance of patronage dividends. Id. at 246. In Buckeye Countrymark, Inc. v. Commissioner, 103 T.C. 547, 559 (1994), this Court relied on the holding in Farm Service to state that subchapter T requires nonexempt cooperatives to distinguish patronage from nonpatronage income in computing its taxable income. This Court went on to note that the effect is to require nonexempt cooperatives to separate income and deductions into patronage and nonpatronage "baskets" because subchapter T limits the deduction for patronage dividends to the net income in the patronage "basket". Id.

Neither Farm Service nor Certified Grocers nor Buckeye Countrymark created a rule that a nonexempt subchapter T cooperative must compute two separate taxable incomes for patronage and nonpatronage activities so as to compute separate DPADs for its patronage and nonpatronage activities. Instead, the purpose of distinguishing and separating patronage income from nonpatronage

income is to ensure that patronage dividends are not paid out of earnings from business done with nonpatrons by virtue of applying patronage-specific deductions or expenses (or a loss created by such deductions or expenses) to nonpatronage income.[31] The Court concludes, therefore, that subchapter T does not require separate computations of taxable income for purposes of section 199 resulting in a "patronage DPAD" and a "nonpatronage DPAD".

The Court's interpretation of section 199 does not create an absurd or unintended result. Section 1.199-6, Income Tax Regs., which provides rules with respect to specified agricultural and horticultural cooperatives, does not address a cooperative's tax accounting and does not require separate segregated DPAD computations for nonexempt subchapter T cooperatives. However, section 199 and its accompanying regulations tend to support an aggregate computation. Under section 199(d)(4) members of an EAG compute the DPAD by aggregating taxable income, QPAI, and Form W-2 wages as if the EAG were a single corporation. Section 1.199-8(h), Income Tax Regs., allows for an aggregate

---

[31]A cooperative taxpayer reports taxable income from both patronage and nonpatronage earnings on Form 1120-C, and net income from patronage earnings is taxable to the extent the cooperative does not distribute it as a patronage dividend. For tax purposes cooperative taxpayers distinguish patronage income and expenses/deductions from nonpatronage income and expenses/deductions on Form 1120-C Schedule G.

computation of DPAD even though there are loss limitations with respect to passive and active activities for purposes of computing taxable income. Even though subchapter T restricts the use of patronage losses, an aggregate DPAD computation by a specified agricultural or horticultural cooperative is consistent with section 199.

The conclusion that section 199 contemplates a single aggregate computation also is most consistent with the legislative purpose behind section 199. This Court has previously stated that the section 199 allowance of a deduction for income attributable to domestic production activities creates incentives for Form W-2 wage job creation within the United States. See Gibson & Assocs., Inc. v. Commissioner, 136 T.C. 195, 223 (2011) ("[T]he statute's wage limitation on the amount of the deduction under section 199(a) indicate[s] that Congress intended that section 199 create jobs * * * and otherwise strengthen the U.S. economy."). There is nothing unique to the Form W-2 wage jobs attributable to domestic production created by a nonexempt subchapter T cooperative that would necessitate separate computations of DPAD with respect to patronage and nonpatronage activities. Nothing in the record indicates that petitioner split domestic production workers or production on the basis of patronage and nonpatronage activities. Instead, once products were delivered, they were

commingled and processed without regard to whether they originated from a member or a nonmember.

Because section 199 provides for a single DPAD computation, the Court concludes that petitioner is not required to compute a "patronage DPAD" and a "nonpatronage DPAD".

B.     Allocation

As discussed supra pp. 43-44, subchapter T requires separation of patronage income and expenses/deductions from nonpatronage income and expenses/ deductions to compute the amount available for patronage dividends and to limit the use of patronage losses.  See Farm Service, 619 F.2d 718; see also Buckeye Countrymark, Inc. v. Commissioner, 103 T.C. 547; Certified Grocers, 88 T.C. 238. The Court now considers whether, once computed, the DPAD must be allocated between patronage and nonpatronage accounts pursuant to the rules of subchapter T.  Subchapter T provides special deductions ultimately to subject patronage income to a single level of taxation.  The theory, though stated in different ways, is that the cooperative acts on behalf of the patron as an agent, and the patronage dividend constitutes a return of the patron's money.  See supra p. 21 and note 16. Nonpatronage income is taxable to the cooperative like the income of an ordinary corporation.  Typically the characterization of an item of income or expense

depends upon the item's relationship to the cooperative's business purpose.  Ill. Grain Corp. v. Commissioner, 87 T.C. at 459.  Where an item of income or expense/deduction is attributable to both patronage and nonpatronage activity, however, it is appropriate to allocate that item between patronage and nonpatronage accounts because to allow otherwise would result in a reduction of income properly taxable to the cooperative as well as the potential enlargement of the amount of patronage income available for patronage dividends.  See Farm Service, 619 F.2d at 723; see also Des Moines Cty. Farm Serv. Co. v. United States, 324 F. Supp. 1216 (S.D. Iowa 1971) (recognizing that because a cooperative's investment capital is used in the production of both patronage and nonpatronage profits, it is logical to require capital stock dividends to be paid ratably out of total net earnings), aff'd, 448 F.2d 776 (8th Cir. 1971).

Petitioner's DPAD is attributable to both patronage and nonpatronage business, but it allocated the entire amount to its nonpatronage income on its Forms 8817 for 2006 and 2007 and on its Schedules G for 2008 and 2009.  As stated supra p. 46, the Court concludes that petitioner need not compute separate DPADs for patronage and nonpatronage activities.  Instead, after DPAD is

computed, it must allocate its DPAD between its patronage and nonpatronage accounts on Schedule G or Form 8817.[32]

## IV. Net Operating Loss

Finally, the Court must decide whether petitioner's EAG may have a net operating loss (NOL) if its DPAD--after allocating to its patronage and nonpatronage accounts--exceeds its taxable income. As a general rule the DPAD is not taken into account in the computation of an NOL or the amount of an NOL carryback or carryover. Sec. 172(d)(7); sec. 1.199-1(b)(1), Income Tax Regs.

Section 199(d)(4) provides a special rule for the computation of DPAD by members of an EAG:

> (4) Special rule for affiliated groups.--
>
> (A) In general.--All members of an expanded affiliated group shall be treated as a single corporation for purposes of this section.
>
> (B) Expanded affiliated group.--For purposes of this section, the term "expanded affiliated group" means an affiliated group as defined in section 1504(a), determined--
>
> > (i) by substituting "more than 50 percent" for "at least 80 percent" each place it appears, and

---

[32]This is also consistent with petitioner's treatment of other items of income and expense/deduction. Petitioner allocated other items of income and expense/ deduction on the basis of the percentage of bushels purchased from members and nonmembers. See supra pp. 15-16.

(ii) without regard to paragraphs (2) and (4) of section 1504(b).

(C) Allocation of deduction.--Except as provided in regulations, the deduction under subsection (a) shall be allocated among the members of the expanded affiliated group in proportion to each member's respective amount (if any) of qualified production activities income.

Section 1.199-7(c)(2), Income Tax Regs., provides the following exception with respect to an EAG's DPAD computation under section 199(d)(4):

(2) Use of section 199 deduction to create or increase a net operating loss. Notwithstanding § 1.199-1(b), if a member of an EAG has some or all of the EAG's section 199 deduction allocated to it under paragraph (c)(1) of this section and the amount allocated exceeds the member's taxable income (determined prior to the allocation of the section 199 deduction), the section 199 deduction will create an NOL for the member. Similarly, if a member of an EAG, prior to the allocation of some or all of the EAG's section 199 deduction to the member, has an NOL for the taxable year, the portion of the EAG's section 199 deduction allocated to the member will increase the member's NOL.

Petitioner wholly owned several entities during the years in issue that were part of its EAG. Petitioner's EAG computed its DPAD in the aggregate under section 199(d)(4) as though it were a single corporation. Petitioner's EAG then filed a consolidated tax return. Petitioner argues that because its DPAD was computed as part of an EAG, section 1.199-7(c)(2), Income Tax Regs., allows petitioner to have NOLs and to carry them back and forward in accordance with

section 172.[33]  Respondent argues that only a member of an EAG which is allocated some or all of the EAG's DPAD may take the DPAD into account in its own NOL computation.  The regulation does not apply, respondent argues, to an EAG as a whole.

The Court must decide whether section 1.199-7(c)(2), Income Tax Regs., is limited to situations in which a member of an EAG is allocated a portion of the EAG's DPAD that creates or increases an NOL on the member's own return.  The allocation to each member is made on the basis of each member's QPAI regardless of the member's taxable income or Form W-2 wages.  Sec. 199(d)(4)(C).  Thus, it is possible for a member who had QPAI but no taxable income to be allocated a portion of the EAG's DPAD that exceeds its own taxable income.  Section 1.199-7(c)(2), Income Tax Regs., applies in that situation.  In contrast, an EAG that consists only of members in a consolidated group must compute its DPAD using the consolidated group's consolidated taxable income or loss, QPAI, and Form W-2 wages.  Sec. 1.199-7(d)(4)(ii), Income Tax Regs.  Then the consolidated group's DPAD is allocated among the consolidated group members on the basis of each member's QPAI.  Id. subpara. (5).  There is no similar exception carved out

---

[33]Cooperatives are permitted to have NOLs and to carry them forward and back in accordance with sec. 172.  Sec. 1388(j)(1); Buckeye Countrymark, Inc. v. Commissioner, 103 T.C. at 560.

to address a situation wherein the consolidated group's DPAD exceeds its taxable income. Accordingly, the Court finds no basis on which to apply the exception where an EAG files a consolidated return.[34] Therefore, petitioner is subject to the general rule under section 172(d)(7), and its DPAD may not be used to create or increase an NOL.

## V.    Conclusion

The soybean and grain payments petitioner made to its patrons (and the similar payments petitioner received as a member of the other cooperative) constitute PURPIMs for purposes of section 1388(f) and must be treated as such for purposes of its DPAD computation. Section 199 does not require petitioner to compute separate DPAD amounts for its patronage and nonpatronage activities. However, once DPAD is computed, petitioner must allocate it between its patronage and nonpatronage accounts. Finally, section 1.199-7, Income Tax Regs., does not apply to petitioner, so under section 172(d)(7) petitioner's DPAD may not be used to create or increase an NOL.

---

[34]An EAG for purposes of sec. 199(d)(4) is defined more broadly than an EAG for purposes of a consolidated return under sec. 1504(a). Therefore, an EAG under sec. 199(d)(4) might compute DPAD for members of the EAG who are not included in a consolidated return. In petitioner's case, it wholly owned each member of its EAG for purposes of sec. 199(d)(4), all of which were part of its EAG for its consolidated return.

The Court has considered all of the arguments made by the parties, and to the extent they are not addressed herein, they are considered unnecessary, moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.